In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re DISAFFIRMANCE of EXECUTORY CONTRACTS.

No. 70–347.

United States District Court, E. D. Pennsylvania.

Aug. 10, 1978.

See also D.C., 458 F.Supp. 1357.

Carl Heimetag, Ralph W. Pickard, Andrew P. Corcoran, Jr., John B. Rossi, Jr.,

Philadelphia, Pa., for Penn Central Trustees.

Fell, Spalding, Goff & Rubin by William P. Quinn, Jon C. Sirlin, Philadelphia, Pa., for Pittsburgh & Lake Erie Railroad Co.

Wexler, Weisman, Maurer & Forman, P. C. by Edward H. Rubenstone, Philadelphia, Pa., for John VanVorst, Mohawk Metals, Village of Frankfort, New York.

Gubman & Sitomer by R. W. Goldfaden, New York City, for Lexington-43rd, Inc.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., New York City, for Industrial Investors Penn Central Group.

Shearman & Sterling by Kenneth M. Kramer, New York City, for Citibank, N. A. as agent for the Committee to Secured Bank Creditors.

Sheinfeld, Maley & Kay by Myron M. Sheinfeld, Houston, Tex., for Shell Oil Co.

Proskauer, Rose, Goetz & Mendelsohn by Steven J. Stein, New York City, for Grand Central Building, New York Life, Bankers Trust Co. and Title Guaranty.

Bachner, Tally & Mantell by Sol V. Slotnik, New York City, for Rose Associates.

Weil, Gotshal & Manges by Michael L. Cook, Lawrence Mittman, New York City, for Madison Square Garden Center, Inc. and Penn Plaza Ventures.

Moses & Singer by Jerome M. Lasky, New York City, for Bankers Trust Co.

Kaye, Scholer, Fierman, Hays & Handler. by Julius Berman, New York City, for 245 Park Avenue Co., 320 Park Avenue Co., Aetna Life Ins. Co.

Pepper, Hamilton & Scheetz by Laurence Z. Shiekman, Philadelphia, Pa., for Consolidated Rail Corp.

Dinsmore, Shohl, Coates & Deupree by Gerald V. Weigle, Jr., Cincinnati, Ohio, for The Procter & Gamble Co.

Jerome P. Schneider, New York City, for The New York Bank for Savings.

Kirk Q. Jenne, Pittsburgh, Pa., for H. J. Heinz Co.

Richard H. Stokes, Gen. Atty., Jamaica, N. Y., The Long Island Rail Road Co.

Drinker, Biddle & Reath by Jack B. Justice, Philadelphia, Pa., Milbank, Tweed, Hadley & McCloy by David C. L. Frauman, New York City, for Chase Manhattan Bank.

Patrick Ramirez S. Bupara, U. S. Dept. of Justice, San Francisco, Cal., for United States and General Services Administration.

Dechert, Price & Rhoads by James E. Hipolit, Philadelphia, Pa., for Weccusor Realty Co.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for Metropolitan Life Ins. Co., Graybar Building Associates, Harry Helmsley d/b/a Graybar Building, Aetna Life Ins. Co., Equitable Life Assurance Society of United States, Prudential Ins. Co.

Hewlett G. Skidmore, pro se.

Fox, Rothschild, O'Brien & Frankel by Nathan L. Posner, Philadelphia, Pa., for Philadelphia Refrigerated Terminals, National Refrigerated Terminals.

Trubin, Sillcocks, Edelman & Knapp by Edward A. Manuel, New York City, for State of New York as Trustee of the Common Retirement Fund.

Ballard, Spahr, Andrews & Ingersoll by F. L. Ballard, Vincent Hatton, Philadelphia, Pa., for Schedule D Indenture Trustees, Girard Trust, Indenture Trustee of Connecting Railway, P.R.R. General Mortgage, Northern Trust, Indenture Trustee, Indiana Harbor Belt Railroad Co., First Mortgage.

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for New Haven Trustee.

Saul, Ewing, Remick & Saul by Guy T. Moore, Philadelphia, Pa., for B & O, C & O, Western Maryland Railway.

Larry Filler, Gaby Gross, Trenton, N. J., for State of New Jersey.

Clark, Ladner, Fortenbaugh & Young by W. Charles Hogg, Jr., Philadelphia, Pa., for Committee of Interline Railroads and Louisville & Nashville Railroad Co.

Clark, Ladner, Fortenbaugh & Young by Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads, and Chicago Union Station Co.

## OPINION AND ORDER RE EXECUTORY CONTRACTS

FULLAM, District Judge.

Section 6.2 of the Penn Central Plan and Section 5.2 of each of the Plans of the Secondary Debtors, provide that all executory contracts other than those affirmed pursuant to §§ 6.1 or 5.1 of the Penn Central and Secondary Debtor Plans are disaffirmed. Specifically reserved from the operation of these sections are all issues relating to the leases between Penn Central and the Secondary Debtors, and between Penn Central and the nonbankrupt leased lines. (For convenience, the Penn Central Trustees, the Secondary Debtor Trustees, and the Connecting will be referred to as the Trustees).

The Trustees' report on executory contracts (Doc. No. 14122), as amended (Doc. No. 14503), sets forth four classes of executory contracts to be affirmed and exceptions with respect to two of these classes. To be affirmed are all contracts in which the Debtors are lessors or lessees, subject to specific exceptions, all options to purchase in favor of the Debtors, and all tax allocation agreements. No one has objected to affirmance of these contracts, and the record demonstrates affirmance is in the best interest of the estate.

In addition, the Trustees specifically reaffirm the Harlem lease which they previously affirmed with this Court's approval. The affirmance of the Harlem lease is subject to certain terms and conditions protective of the interest of the Harlem's equity and debt holders. The Indenture Trustees of the Harlem bonds and the Harlem have agreed on the terms of those conditions. Equity holders have been protected by a fund adequate to service the dividends due on the publicly held stock of the Harlem and to permit purchase of the outstanding stock, at least over time, if the reorganized company undertakes a purchase effort. The Court has reviewed those terms and finds that they are in accord with the suggestions of the Securities and Exchange Commission in its report in connection with

the Plan and otherwise fair and equitable and, therefore, the conditions are hereby approved by the Court.

A number of parties have objected to the Trustees' purported disaffirmance of their contracts, and after hearing some objectors have filed extensive briefs. It is clear that in a number of instances fundamental legal questions have been raised which are amenable to resolution without the need to further develop the factual evidence.

## A. RAILROAD–RELATED CONTRACTS

The conveyance to ConRail terminated the Trustees' prior business activity—supplying freight and passenger train service. As a consequence, the bulk of the contracts the Trustees seek to disaffirm, approximately 175,000 in number, relate in one way or another to their prior ownership of rail property or the provision of train service. The general categories of these agreements are as follows: wire, pipe and private grade-crossing agreements; joint facility and trackage right agreements; side-track agreements; bridge maintenance agreements; collective bargaining agreements with operating employees; agreements relating to the furnishing of material and supplies; agreements with respect to office, data processing and computer equipment; and utility agreements.

Most, but not all, of these agreements have been assumed by ConRail pursuant to the Regional Rail Reorganization Act (RRRA).[1] With respect to the contracts assumed by ConRail, the Trustees' disaffirmance serves a rather limited procedural purpose, because no damages flow from disaffirmance. Disaffirmance in this context is merely a procedural convention for putting the other party on notice that any claim arising under the contractual relationship will have to be asserted in the reorganization proceedings.[2] The Trustees concede that with respect to claims arising between the filing of the § 77 petition and the conveyance of the properties to ConRail, the contracting party's claim will be an administration claim, and in most instances the amount will be determined in accord with the terms of the contract. Many, but not all, of these claims will be eligible for § 211(h) funding and will be paid in cash through the Agency Agreement with ConRail. The others will be classified as administration claims and satisfied pursuant to the Plan.

■ Therefore, disaffirmance of the contracts assumed by ConRail is not even necessary because the result sought by the Trustees could be achieved as easily by simply directing that post-petition claims be filed. On the other hand, since there are some contracts which have not been assumed, and since the Trustees have initiated the procedure through the disaffirmance mechanism, it may well be that it will be simpler in the proof of claims process to denominate the claimants as executory contract claimants.

■ The Long Island Railroad Company has filed the only objections on the merits of the Trustees' disaffirmance. The Long Island and the Penn Central entered into a joint facility agreement covering Penn Station in New York in 1966. The basis for the Long Island's objection to the disaffirmance of this agreement is somewhat obscure. ConRail assumed the agreement and thereafter assigned it to Amtrak. The Long Island recognizes that in this context disaffirmance is of little consequence. The real points in issue appear to be the Long Island's desire to have all its claims against the Trustees resolved in proceedings separate from those involving any other claimants (Tr. 17993–96), and the Long Island's assertion that administration claim status is inappropriate for its claim under the joint facility arrangement because the Trustees' obligations to the Long Island should be characterized as trust obli-

---

1. 45 U.S.C. §§ 701 et seq.

2. ConRail has expressed concern over the possibility that the Trustees' purported rejection of contracts assumed by ConRail will somehow or other be construed as constituting a rejection of the contracts which deprives ConRail of the benefits of its assumption of the contracts. Obviously, this is not the case, and the Trustees' petition in no way suggests that result.

gations. The second point may be mooted when the post-bankruptcy amount of the Long Island's claim is determined, because the claim appears to be eligible for payment under § 211(h). The reasoning of the Long Island for its conclusion that § 211(h) funding will not be available is simply without merit. With respect to the trust relationship theory, the Long Island is free to assert that status in connection with the Proof of Claims Program or otherwise.

Separate handling of the Penn Central-Long Island relationship may well be what the future holds. Liquidation of unresolved claims will be a high-priority function of the new company, both because it is in everyone's interest that the claims be liquidated promptly, and also because this Court will require that the liquidation process proceed as quickly and fairly as possible. Failing amicable resolution of the Long Island's claim (a process which appears to have been pursued actively by the Trustees to date), its claims will have to be presented to this Court. It is understandable that the Long Island, and I am sure many other claimants, feel some frustration over the fact that their claims have not been liquidated or otherwise determined by now. The fact is, however, that the Trustees' efforts have been properly directed to the larger questions of providing rail services through April of 1976, and thereafter to the development and prosecution of a Reorganization Plan. In sum, while the Court understands the Long Island's position, it simply has no bearing on the question of disaffirmance of executory contracts.

■ The Chessie System and the Committee of Interline Railroads have raised what is essentially a procedural objection: The Trustees must give notice to each contracting party of the precise contract or contracts disaffirmed. Notice has been given to potential claimants, but it is not possible at the present time to identify, except by classes, the contracts which are disaffirmed. The contracts are in the possession of ConRail, and even though a large commitment of time and money has been made by the Trustees and ConRail to sorting out which contracts were assumed and to identifying the contracting party, the process will not be completed for many years. This situation is simply another example of the pervasive effect of the RRRA on this reorganization. The lack of specific notice has two possible impacts: (1) the potential inability to raise arguments that a given contract is not an executory contract for the purposes of § 77; and (2) the inability to file a timely claim.

Of the two, the first point is more troublesome but of limited effect. As to contracts assumed by ConRail, there can be no realistic objection to the idea that claims under the contracts may be asserted against the Trustees or the reorganized company. That is all that the disaffirmance petition seeks to accomplish. As to contracts not assumed, the acknowledgement of administrative claim status for post-bankruptcy-pre-conveyance obligations solves most of the problem. Damages flowing from rejection of contracts which were not assumed are somewhat different, but even here it seems highly unlikely that any party to a contract will have such a claim based on rejection unless the contract is in fact an executory contract which may be disaffirmed. With respect to the filing of claims, no order has yet been entered requiring the filing of post-bankruptcy claims or claims arising from disaffirmance. When that order is before the Court, appropriate accommodations may have to be made to take account of the Trustees' and the potential claimants' lack of information. However, it should be noted that it is consistent with general bankruptcy practice and *prima facie* reasonable to expect claimants to determine whether or not they have a claim.

■ New Jersey has also asserted a procedural objection similar to that raised by the railroad objectors. However, the State contends in addition that the public interest of her citizens may be adversely affected if disaffirmance is authorized without notice to each unit of local government specifying the exact contract or contracts which are disaffirmed. The State's concern seems based in part on the assumption that disaffirmance "voids" the contract

as well as any liability for non-performance after disaffirmance. This, of course, is not true. Liabilities arising from disaffirmance may be asserted in the Reorganization Court. The two specific examples mentioned by the State also appear to be overstated. It is suggested that disaffirmance of a pipeline contract will prevent local governments from running sewer lines. If the property in question has been conveyed to ConRail, the pipeline contract will be enforceable against ConRail, or it will not. If it is not enforceable against ConRail, there is nothing the Trustees can do to force ConRail to permit the sewer to be laid. If a claim arises from a lack of enforceability against ConRail, the claim will be against the United States under the Tucker Act or against the Trustees. In the latter event, a claim may be asserted in the Reorganization Court. The same analysis is applicable to the bridge maintenance agreements mentioned by New Jersey. The upshot of this is that the real problem for New Jersey is in the framing of the Order requiring that its claims be filed.

■ It is necessary to point out, however, that the Trustees have proceeded, as indeed they were forced to, in broad fashion. An inherent limitation of this procedure is that the Court may only approve disaffirmance of those contracts which are in fact executory. Consistently, therefore, a party asserting his contract is not executory will be entitled to be heard on that issue as part of the proof of claims procedure, or otherwise. This resolution is not ideal from some perspectives. Yet, it is unlikely that there are more than a small number of instances in which there are any real disputes. Resolution of one or a handful of cases will probably serve as precedent for the balance.

### B. BOND GUARANTEES AND OPERATING AGREEMENTS

The Trustees also seek to disaffirm guarantees of Chicago Union Station Company Bonds; Chicago River & Indiana Railroad Company Bonds; Trailer Train Company Joint and Several Guarantees of Conditional Sale Agreements; and the Waynesburg Southern R.R. Co. Bonds.[3] Operating agreements with the Pennsylvania-Reading Seashore Lines (PRSL), Monongahela Railway Company, and the Chicago Union Station Company are also disaffirmed by the Trustees.

■ The question of whether or not the Trustees may validly disaffirm bond guarantees was raised early in these proceedings when the Trustees gave notice of disaffirmance to a large number of beneficiaries of bond guarantees. Challenges to the purported disaffirmances were pending when the Plan was proposed, and the issue was again litigated in connection with the Plan proceedings. In the Approval Opinion,[4] this Court held that once a Plan was approved, the question of whether or not guarantees were executory was no longer relevant. Rather, the guarantees are contingent unsecured claims against the estate which are provable and dischargeable under § 77. This same conclusion applies generally to the four guarantees mentioned above. Precisely how these claims will be quantified and under what conditions, if any, distributions of securities of the new company will be made remains to be determined.

■ Fidelity Bank as Indenture Trustee of the Waynesburg Southern Bonds has raised an aspect of its particular situation which has not been previously considered. The Waynesburg Southern is a wholly-owned subsidiary of Penn Central. Waynesburg's 36 miles of railroad were constructed in 1968, and thereafter leased to the Monongahela Railroad, which was jointly owned by the P&LE, the B&O, and Penn Central. The Waynesburg Bonds are guaranteed by the B&O, P&LE, and Penn Central. As part of the conveyance, Penn Central's stock interest in the Monongahela was conveyed to ConRail and the Waynesburg's property was also conveyed to ConRail. Fidelity seeks to have the Court now

---

3. By agreement of counsel, the disaffirmance of the guarantee of the Pennsylvania Tunnel & Terminal Notes has been deferred.

4. *In re Penn Central Trans. Co.*, 458 F.Supp. 1234, 1346 (E.D.Pa.1978).

direct that any *Valuation Case* proceeds attributable to the Waynesburg property be applied upon receipt by the Trustees to discharge the Waynesburg Bonds. On its face, such a protective provision appears to be reasonable and fair protection for the Waynesburg bondholders, as well as the co-guarantors of the Waynesburg Bonds. The Trustees have never had an opportunity to fully respond to this specific suggestion, and therefore the issue will be reserved in order°to permit the Trustees 20 days within which to file a response.

The Pennsylvania-Reading Seashore Lines objected to rejection of its contract. Sixty-six percent of the stock of the PRSL is owned by the Penn Central Trustees, and the balance is owned by the Reading Trustee. Prior to the conveyance, PRSL was the lessor of rail lines owned by the West Jersey & Seashore Railroad Co. Under the ICC Order which permitted consolidation of certain rail lines in South Jersey, 193 ICC 183 (1933), the Penn Central and the Reading are obligated to advance money to PRSL to meet its operating deficits. PRSL's rail operations ceased when West Jersey's property was conveyed to ConRail and the PRSL is in the process of winding up its affairs. It is asserted by PRSL that it owes substantial monies to West Jersey and interline carriers, and also may be liable for property damage, freight, and employee claims. Its contention is that the ICC Order and considerations of equity require that Penn Central satisfy these obligations. These contentions have not been addressed by the Trustees. The Trustees will be accorded an opportunity to file a response within 20 days.

Finally, the Chicago Union Station Company has objected to rejection of its contract with the Trustees. The Burlington Northern and the Milwaukee Road each owns 25% of the stock of the Station Company, and prior to the conveyance Penn Central owned the remaining 50%. The Station Company and its owners many years ago entered into a contract pertaining to the operation of the facility which imposed certain financial obligations on the owners. In addition, the owners guaranteed the Station Company's bonds. Penn Central's guarantee obligation will be satisfied through the proof of claims procedure. The Station Company has objected to disaffirmance by Penn Central of its contractual obligations. Although the contract is clearly executory in character and, therefore, may be disaffirmed, the conveyance has placed the Station Company in a unique position. Penn Central's stock ownership in the Station Company is now owned by ConRail, but ConRail did not assume Penn Central's contractual obligations. Yet, ConRail is presumably running passenger trains for Amtrak through the Station. Whether ConRail is paying for its use of the Station is not clear. The unique aspect of the situation is, of course, the fact that ConRail was not required to assume the contract, but it has from an operational point of view been substituted for the Trustees. Notwithstanding this distinguishing factor, disaffirmance by Penn Central of the contract is still proper. The Station Company's remedy is obviously against someone other than Penn Central.

## C. LEASES

With respect to leases in which the Debtor is the lessee, the Trustees propose to disaffirm only a few such leases, and none of these lessors has objected to the proposed disaffirmance. These contracts are clearly executory in character, and I am satisfied that it is in the best interests of the Debtor's estate and its reorganization to permit the proposed disaffirmance.

In contrast, however, the Trustees' proposal to disaffirm some 37 leases in which the Debtor is lessor has met strenuous opposition from the lessees. For convenience, these leases can be separated into two groups: (1) a group of 11 leases of property located in mid-Manhattan, all of whose lessees have filed objections to disaffirmance; and (2) leases of other property scattered throughout the system, as to 10 of which objections have been filed by the lessees.

The mid-Manhattan leases are classic examples of ground-lease development. Penn Central leased the land or air rights to the ground lessees for lengthy initial periods, and the lessees have one or more long-term

renewal options. The lessees have constructed large office buildings on the properties. The improvements were financed through mortgages secured by the improvements and the lessees' leasehold interest in the ground. These mortgages, aggregating very substantial amounts, are held principally by various insurance companies and by the New York State Employee Pension Fund.

The typical leases provide that the lessee pay a basic annual rent plus additional rent computed on a percentage formula. With one exception, the lessees also pay all real estate taxes attributable to the building, and in many instances pay to the Trustees an amount equal to, or only slightly less than, the taxes attributable to the ground or air rights. In short, the leases are "net" leases. There are no financial obligations on the Trustees other than the payment of some taxes. The leases generate very substantial cash flow for the Debtor's estate.

From the standpoint of the lessees, on the other hand, the situation is more complex. The office buildings are large, and the lessees have entered into countless numbers of space leases in the buildings. While some of these leases are short-term, others are for extended periods. Moreover, the lessees, in operating the buildings, must compete for tenants in what is at times a highly competitive New York market; and they must deal with inflationary factors and rising real estate taxes affecting their costs, and generally run the risks associated with a volatile and highly competitive entrepreneureal venture.

The Trustees have concluded that the rentals paid by the lessees to the estate under the existing leases are less than the fair market rental for equivalent property in today's market. For present purposes, it will be assumed that this conclusion is correct. Thus, the Trustees' purpose in proposing to disaffirm these leases is to enable them to increase the rentals to the present fair market level, thus dramatically increasing the value of the Trustees' interest in the properties. Since these properties will eventually be sold pursuant to the Asset Disposition Program, the net effect of approving the Trustees' proposal would be to increase, quite substantially, the avails of the Asset Disposition Program.

It should be noted that the ultimate impact upon the Debtor's estate from pursuing the proposed course of action would be to expedite the satisfaction of the claims of secured creditors, and to dilute the participation by the general creditors and equity holders. That is, the lessees would have claims against the estate for damages occasioned by the disaffirmances, but these claims would be classified as unsecured prebankruptcy claims. However, no one entitled to object on that ground has expressed any objection to the Trustees' proposed disaffirmances. Moreover, if the lessees were held to be under an obligation to mitigate damages by passing the increases along to the sub-tenants, or if, as seems likely, they would choose that course in any event, the increase in unsecured claims against the estate might be relatively modest.

Section 70(b) of the liquidation provisions of the Bankruptcy Act, 11 U.S.C. § 110(b), authorizes the Trustee to reject "any executory contract, including unexpired leases of real property," but includes the following protective provision for the benefit of lessees:

> "Unless a lease of real property shall expressly otherwise provide, a rejection of such lease or of any covenant therein by the trustee of the lessor shall not deprive the lessee of his estate."

The objecting lessees' argument that disaffirmances in the present case are barred by that language presents two issues which have long occasioned debate among bankruptcy experts: (1) What is the "estate" of which the lessee may not be deprived; and (2) Is § 70(b) applicable in reorganization proceedings? Detailed exposition of all facets of these controversies would unduly lengthen this Opinion, and is unnecessary to the present decision.[5]  A brief outline of

5. The problems are thoroughly aired, pertinent legislative history reviewed, and applicable decisions canvassed in Silverstein, *Rejection of*

*Executory Contracts in Bankruptcy and Reorganization*, 31 U.Chic.L.Rev. 467, 484–97 (1964). *See, also*, Countryman, *Executory*

these issues is, however, useful to an understanding of the proper resolution of the present case.

■ Even in liquidation proceedings, to which § 70(b) is clearly applicable, the bar against depriving the lessee of his estate cannot reasonably be interpreted as an absolute bar against all interference with the lessee's rights in the event of the lessor's bankruptcy. If that were the Congressional intent, the language would no doubt have limited the power of rejection of leases to those instances in which the bankrupt is the lessee. One theory, which has many adherents among the commentators, is that the lessee's "estate" which is protected is his right of possession, together with all covenants running with the land in his favor. Implementation of that theory may involve difficult questions as to what covenants do run with the land, and by what law those issues are to be decided. Does state law control, does state law control unless it is aberrational and contrary to the goals of federal bankruptcy law, or does federal bankruptcy law control entirely?

In the present case, the Trustees argue that they are disaffirming only the lessor's affirmative obligations under the lease (here, virtually nil)[6] and the lessees' obligation to pay the rent specified in the lease.[7] In their view, the lessees' possession would not be disturbed, but the rental would be renegotiated, and fixed at current market levels. If the lessees failed to pay the new rent, they could be evicted, but in that event their ouster would flow from breach of their modified rental obligations, and not from the Trustees' disaffirmance. The les-

sees, on the other hand, present the rather appealing argument that the rent covenants go to the very heart of the lease transaction, and that to exact increased rent payments on pain of eviction would be tantamount to depriving them of their estates, in violation of § 70(b).

This brings us to the question of whether § 70(b) is applicable in reorganization proceedings under § 77 of the Bankruptcy Act. It is clear that § 70(b) does apply here, unless its application would be inconsistent with § 77.[8] *Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945), teaches that the question of whether or not a specific section of the Bankruptcy Act is to be considered inconsistent with § 77 must be approached cautiously; and that a holding of non-applicability is not appropriate merely because application of a particular section may undermine the prospects of successful rehabilitation.[9]

Section 70(b) is aimed at rejections which, at least in the ordinary course, would occur early in the proceedings. In considering whether these provisions are, or are not, consistent with § 77, it is important to bear in mind that, in straight liquidation proceedings, the rights of a lessee may be adversely affected otherwise than through rejection of the lease by the lessor; and that a plan of reorganization in § 77 proceedings is a mechanism which, *inter alia*, replaces a liquidation sale as the ultimate determinant of the respective rights of the parties. In a straight liquidation proceeding, for example, if the lease is subordinate to a mortgage, and the property burdened

---

*Contracts in Bankruptcy* Part 2, 55 Minn.L.Rev. 479, 527. These issues are also explored in detail in Creedon & Zinman, *Landlords Bankruptcy: Laissez Les Lessee*, 26 Business Lawyer 1391 (1971), but I prefer not to rely on the authority of this article in the present case, because of the possibility that it may have been written in anticipation of the present litigation.

**6.** There is some indication in the record that under one or perhaps two leases the Trustees are obligated to provide utility service.

**7.** Whether an obligation due to the Debtor may be disaffirmed is an issue which is not definitively resolved by the cases.

**8.** Section 77 (*l*). The cases under the other rehabilitation chapters of the Act have generally held that § 70(b) is not inconsistent with the reorganization chapters. 6 Collier *Bankruptcy* 3.24[1–1]. *See* Silverstein, *Rejection of Executory Contracts in Bankruptcy and Reorganization*, n. 5 *supra*.

**9.** *See* Countryman, *Executory Contracts in Bankruptcy and Reorganization*, Part 2 (n. 5 *supra*).

by the lease is worth less than the amount due on the mortgage, the leasehold is undoubtedly vulnerable. So too, rejection of a lease in a plan of reorganization under § 77 may be necessary to an appropriate adjustment of the rights of all creditors, in application of the absolute priority rule. That is, the absolute priority rule would be violated if the lessee's rights remained untouched, while the rights of a senior mortgagee secured by the leased property were adversely affected in various ways.

The correct formulation of this analysis is elusive.[10] It can be said that rejection of a lease in a plan of reorganization differs from rejection in the course of the proceedings, and that § 70(b) is consistent with § 77 only with respect to the latter kind of disaffirmance. Or it can be said that § 70(b) of the Bankruptcy Act is inconsistent with § 77, and therefore not applicable, in any case in which implementation of the bar of § 70(b) would render a plan of reorganization violative of the absolute priority rule or otherwise unfair and inequitable.

In the present case, all of the Debtor's mortgages have been subordinated to the mid-Manhattan leases here in question, so no conflict with the absolute priority rule arises.[11] There is therefore no compelling reason for failing to apply the strictures of § 70(b), and it matters little whether § 70(b)

is held directly applicable or is regarded as a useful analogy. And equitable considerations,[12] in my judgment, preclude enforcement of the Trustees' rent covenant versus possessory estate interpretation of § 70(b). The lessees are not creditors of the estate, who extended credit and took the risks of such extensions. There are no burdensome affirmative covenants.[13] The leases were negotiated at arms length; if they are less attractive now than they might be, the difference is attributable solely to changes in the economic climate and not to the Debtor's financial reverses. The bankruptcy laws are intended as a shield, not as a sword. Their purpose is to minimize fiscal chaos and disruption, not to aggravate it.

In short, I have concluded that disaffirmance of leases in which the Debtor is the lessor should not be permitted.

## ORDER

AND NOW, this 10th day of August, 1978, it is ORDERED that:

1. The Trustees' affirmance of the Harlem lease on the terms and conditions specified in the Trustees' Consummation Exhibit No. 6 is APPROVED.

2. The Trustees' affirmance of prebankruptcy contracts (a) pursuant to which there were retained options or rights of

---

10. The House has recently passed H.R. 8200 which is a complete revision of the Bankruptcy Act. Section 365(h) of that bill provides that the lessor may reject, but the lessee may not be deprived of possession. The only remedy of the lessee is to terminate the lease or remain in possession and offset damages arising from rejection against post-rejection rentals. No matter how one views the line drawn in § 365(h), the section has the advantage of bringing clarity to an area of bankruptcy practice sorely in need of clarification.

11. Although there is no evidence in the record relating to subordination, the lessees have made the representation that the mortgages are subordinated, and in connection with other mid-Manhattan leases the records have shown that the mortgages were subordinated. As to the 10 leases of other property throughout the system, presumably the same practice was followed. In any event, the equities are in favor of not permitting the Trustees to reject objectors' leases.

12. Of primary significance are the following: (1) reliance by the lessee and the leasehold mortgagees in validity of the lease; (2) the theoretical possibility that the lease might fall into default and the Trustees would become the owners of the buildings; (3) the difficulty in Court supervision of the negotiations concerning new rents; (4) for the treatment under the Plan of all mortgages as fully secured; and (5) even without disaffirmance of the leases the various interests in the estate will receive fair and equitable treatment under the Plan.

13. I do not mean to suggest that the power to disaffirm executory contracts is limited to those which are burdensome. Although that theory has been earnestly pressed in this case, the law is to the contrary: *Group of Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 318 U.S. 523, 549–56, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

first refusal now or in the future exercisable by any of the Debtors or their successors, (b) tax allocation agreements, and (c) all leases of non-operating real property under which the Trustees are lessee, except those listed on Schedule B (revised) of Doc. No. 14503, is APPROVED.

3. With respect to the leases under which the Trustees are lessor: (a) the Trustees' affirmance of those not listed on Schedule A (revised) of Doc. No. 14503 is APPROVED; (b) the objections of certain lessees and other parties in interest to the disaffirmance of their leases through inclusion on Schedule A (revised) are SUSTAINED, and the leases are AFFIRMED; and (c) the leases listed on Schedule A (revised) for which no one filed an objection are DISAFFIRMED unless, within thirty (30) days after service upon such lessee of a copy of this Order, such lessees thereunder file with this Court a petition for an Order to affirm such leases, in which event the Court will rule thereon.

4. The Trustees shall serve a copy of this Opinion and Order on the lessees under leases which are disaffirmed pursuant to Paragraph 3 of this Order.

5. Disaffirmance of all other executory contracts pursuant to and subject to the limitations of § 6.2 of the Penn Central Plan and § 5.2 of the Plans of the Secondary Debtors, is APPROVED, provided that decision is reserved with respect to the Trustees' disaffirmance of the guarantee of the Pennsylvania Tunnel & Terminal Notes and the issues discussed in the accompanying Opinion with respect to the requested conditions of disaffirmance of the Pennsylvania-Reading Seashore Lines operating contract and the Waynesburg Southern Bond guarantee.