PER CURIAM:
 

 The United States Bankruptcy Court for the Southern District of Florida permitted a financially secure individual and his wife to file a joint Chapter 13 petition in bankruptcy ‘.‘for the sole purpose of rejecting an option agreement.” The district court affirmed the bankruptcy court’s order. We reverse.
 

 I.
 

 On June 24,1983 Edward J. Waldron and his wife Elizabeth filed a joint voluntary petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301-1330 (1982 & Supp. II 1984). The Chapter 13 petition listed one creditor, Shell Oil Company, but the Waldrons, in fact, owe no debts.
 
 [1]
 
 The
 
 *938
 
 Waldrons are completely solvent, own a home in Coral Gables, Florida valued at $125,000.00 and an impressive portfolio of stocks. The Waldrons also own, subject to an option agreement, a parcel of land located at 2727 West Flagler Street in Miami, Florida.
 

 On January 15, 1964 the Waldrons had granted Shell Oil the option to purchase this parcel of land. The option agreement provided that Shell Oil would have the right to exercise the option at a price of $40,000.00 “at any time after January 1, 1984” through December 31, 1993. The Waldrons granted Shell Oil this option as part of a single transaction in which Shell Oil purchased for $100,000 an adjacent parcel of land from Mr. Waldron’s father and an easement in front of the parcel located at 2727 West Flagler Street. Shell had desired to purchase both parcels of land in 1964 to construct a full facility service station but agreed to the two step procedure to accommodate the Waldrons. The option agreement recited a consideration of $10.00 and Mr. Waldron later stipulated that he actually received the money. The option agreement, the easement granted to Shell Oil and the warranty deed for the adjacent parcel were recorded simultaneously in the Official Records of Dade County, Florida.
 

 In their Chapter 13 petition, the Wal-drons sought to reject the option agreement pursuant to 11 U.S.C. § 365(a) (1982).
 
 [2]
 
 Mr. Waldron, an attorney specializing in bankruptcy law, admitted that he “filed this Chapter 13 for the sole purpose of rejecting [the] option agreement.” Financially secure and without any debts, the Waldrons thus set out to use the bankruptcy process in attempting to reject a contract which they felt might not be as profitable as it could be.
 
 [3]
 
 In essence, the Wal-drons wanted to breach the option agreement and prevent Shell Oil from seeking specific performance in state court.
 
 [4]
 

 Initially, the bankruptcy court questioned the Waldrons’ preposterous scheme. The court recognized that the Waldrons were not financially distressed and had no real need to invoke the protections of the bankruptcy laws.
 
 [5]
 
 Nevertheless, the bank
 
 *939
 
 ruptcy court concluded that the bankruptcy laws were intended to be widely available and thus even a “trouble-free debtor” must not be “precluded from utilizing Chapter 13 solely to reject the option contract.”
 
 In re Waldron,
 
 36 Bankr. 633, 636 (Bankr.S.D.Fla.1984). The district court upheld the bankruptcy court’s order. This appeal promptly followed.
 

 II.
 

 The Bankruptcy Code expressly provides that a bankruptcy court may not confirm a Chapter 13 plan unless “the plan has been proposed in good faith and not by any means forbidden by law.” 11 U.S.C. § 1325(a)(3) (1982). Indeed, “the ‘good faith’ requirement of § 1325(a) is the only safety valve available through which plans attempting to twist the law to malevolent ends may be cast out. The good faith test should be used accordingly.”
 
 In re Leal,
 
 7 Bankr. 245, 248 (Bankr.D.Colo.1980). In this case, the bankruptcy court should have used the good faith test to cast out the Waldrons’ malevolent scheme.
 
 [6]
 

 While it is difficult to discern the congressional intent behind section 1325(a)(3) because of a dearth of legislative history, the term “good faith” is certainly not new to bankruptcy law. Section 141 of the Bankruptcy Act of 1898, 11 U.S.C.A. § 541 (West 1979) (repealed 1979), required that a Chapter X petition for corporate reorganization be filed in good faith or face dismissal. Section 146 of the Act, 11 U.S.C.A. § 546 (West 1979) (repealed 1979), set forth four specific criteria of the term “good faith” but emphasized that the meaning of the term was not to be limited by these four tests. Cases interpreting sections 141 and 146 have therefore defined good faith broadly:
 

 Basically, the general elements of good faith, undefined in the statute, mean that
 
 the petition must be filed with the honest intent and genuine desire to utilize the provisions of Chapter X for its intended purpose
 
 — to effectuate a corporate
 
 reorganization
 
 — and
 
 not merely as a device to serve some sinister and unworthy purpose
 
 of the petitioner.... The court cannot and will not tolerate such misuse of the reorganization process.
 

 In re Southern Land Title Corp.,
 
 301 F.Supp. 379, 428 (E.D.La.1968) (emphasis added).
 
 See also Mongiello Brothers Coal Corp. v. Houghtaling Properties, Inc.,
 
 309 F.2d 925, 930 (5th Cir.1962) (“[i]n considering the presence or absence of good faith, it must be borne in mind that the Act is not to be abused by the extension of its privileges to those not within the contemplation of it_”). These discussions are equally applicable to the good faith provision in Chapter 13.
 
 See In re Leal,
 
 7 B.R. 245, 247 (Bankr.D.Colo.1980).
 

 In this case, the Waldrons admittedly filed their Chapter 13 petition for the sole purpose of rejecting the option agreement with Shell Oil. The Waldrons were not financially distressed and had no real need for the bankruptcy process.
 
 [7]
 
 The Wal-
 
 *940
 
 drons’ only motive was to enhance their financial coffers by manipulating and abusing the bankruptcy process. Their Chapter 13 petition should not have been confirmed.
 

 “The bankruptcy laws are intended as a shield, not as a sword.” In
 
 re Penn Central Transportation Co.,
 
 458 F.Supp. 1346, 1356 (E.D.Pa.1978). Congress could not have intended that the debt-free, financially secure Waldrons be permitted to engage the bankruptcy machinery solely to avoid an enforceable option contract. From all that appears, the contract was negotiated at arms length; if the Waldrons now feel that it is less attractive than it should be, the difference is attributable to changes in the economic climate not to the Waldrons’ financial situation. See
 
 id.
 
 The bankruptcy laws were simply not intended to be used as a sword by the rapacious.
 

 Nevertheless, the bankruptcy court permitted the Waldrons to reject the option contract because “it is clear that [the Wal-drons] could readily refile their bankruptcy petition under Chapter 11.”
 
 In re Waldron,
 
 36 B.R. at 635. Apparently, the bankruptcy court relied on cases which hold “that it is not an abuse of the bankruptcy process to file a petition under Chapter 7 or 11 solely to reject an exec-utory contract.”
 
 Id.
 
 (citing
 
 In re Bofill,
 
 25 B.R. 550 (Bankr.S.D.N.Y.1982) and also relying on
 
 In re Marina Enterprises,
 
 14 B.R. 327 (Bankr.S.D.Fla.1981)). The bankruptcy court, however, failed to recognize the true import of these decisions.
 
 [8]
 
 In each case, rejection of the executory contract served a useful purpose for a debtor who was indeed financially troubled. In each case, rejection was permitted to serve the intended purpose of Chapter 11 — to facilitate the adjustment of debts through reorganization.
 

 For example, in
 
 In re Marina Enterprises,
 
 a Chapter 11 debtor-in-possession, whose sole asset was an undeveloped parcel of land subject to a lease, applied for rejection of the lease. The bankruptcy court permitted rejection, finding that “there can be no realistic anticipation of successful reorganization or rehabilitation without rejection of the lease.” 14 B.R. at 333. The bankruptcy court also recognized that “the rent [the debtor-in-possession was to receive under the lease] will probably not cover debt service, much less give a realistic return on investment,”
 
 id.
 
 at n. 4, and noted that the debtor-in-possession “was unable to obtain construction financing” because of the improvident lease.
 
 Id.
 
 at 333. Indeed, rejection was necessary to successfully reorganize the debtor-in-possession’s business and allow the financially troubled debtor a “fresh start.”
 

 Similarly, the bankruptcy court in
 
 In re Bofill,
 
 cautioned that section 365 of the Bankruptcy Code “is not a ‘legal loophole.’ ” 25 B.R. at 552 (citation omitted). Rejection of an executory contract under section 365 must therefore only be permitted to serve some useful purpose such as providing a troubled debtor with a “fresh start.”
 
 See id. See also NLRB v. Bildisco & Bildisco,
 
 465 U.S. 513, 527, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) (“[s]ince the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action”).
 

 In this case, rejection of the option agreement with Shell Oil would serve no such policy or purpose. The Waldrons have no debts; they are financially secure. In fact, their liquid assets will be increased by $40,-000 when Shell Oil exercises its option to purchase the land at 2727 West Flagler
 
 *941
 
 Street. The Waldrons’ plan was thus proposed in a bad faith attempt to use and abuse Chapter 13 for a greedy and unworthy purpose. Congress could not have intended such a result in enacting Chapter 13. Permitting the financially secure Wal-drons to avoid the option agreement with Shell Oil would prompt a flood of litigation: any business that proves it miscalculated could avoid unprofitable deals through the bankruptcy process. This result makes a travesty of the bankruptcy process. The Waldrons' petition must be dismissed.
 

 III.
 

 We hold that with section 1325(a)(3) Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose. Accordingly, whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor’s motives. If the court discovers unmistakable manifestations of bad faith, as we do here, confirmation must be denied.
 

 Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.
 

 The cornerstone of the bankruptcy courts has always been the doing of equity. The protections and forgiveness inherent in the bankruptcy laws surely require conduct consistent with the concepts of basic honesty. Good faith or basic honesty is the very antithesis of attempting to circumvent a legal obligation through a technicality of the law. The Waldrons, it seems clear to us, sought to abuse the process through a technicality to serve their own malevolent and selfish aims. This abuse should not have been permitted. We therefore reverse the decision of the district court and remand with instructions to dismiss the Waldrons’ petition.
 

 REVERSED and REMANDED.
 

 [1]
 

 . The Waldrons listed $10.00 as an unsecured debt owed to Shell Oil. The Waldrons claimed the $10.00 was the "refund of alledged [sic] deposit made for Option Agreement per Chapter 13 Plan.” This $10.00 figure, however, was not a debt at the time the Waldrons filed their petition. The $10.00 could only become a debt if a court permitted the Waldrons to reject the option agreement as an executory contract.
 
 See
 
 
 *938
 

 infra
 
 note 2. The debt would then be the damages awarded, not necessarily limited to $10.00.
 

 The Waldrons later filed an amended Chapter 13 petition listing two other unsecured creditors. The Waldrons stipulated, however, “that they did not and would not rely on the amended petition to support their position."
 
 In re Waldron,
 
 36 B.R. 633, 635 n. 1 (Bankr.S.D.Fla.1984). The Waldrons, therefore, must be considered debt-free.
 

 [2]
 

 . Section 365(a) reads: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court’s approval, may assume or reject any executory contract or unexpired lease of the debtor."
 

 [3]
 

 . The fair market value of the parcel of land located at 2727 West Flagler Street was approximately $145,000.00 when the option became exercisable on January 1, 1984. Shell Oil, who owned the adjacent parcel, claimed that the value of the Waldron's parcel was, from its perspective, $195,000.00.
 

 [4]
 

 . The Waldrons further sought to limit Shell Oil's damages to $10.00 — a refund of the consideration recited in the option agreement. The bankruptcy court disagreed with this approach, deciding that:
 

 Shell is entitled to the ‘benefit of the bargain;’ that is, the difference between the estimated market value of the property at the time the option becomes exercisable on January 1, 1984, less the option agreement price, plus an additional speculative premium, if any, reflecting anticipated appreciation of the value of the property at the time the option will lapse on December 31, 1994 [sic], as well as any additional loss suffered by Shell as the natural and proximate result of the breach.
 

 In re Waldron,
 
 36 B.R. at 642 (citations and footnote omitted). On appeal, both the Wal-drons and Shell Oil contest the bankruptcy court’s damage formula. We need not reach this issue, however, having decided that the Waldrons’ Chapter 13 petition must be dismissed.
 

 [5]
 

 .As Shell Oil noted in its brief, the bankruptcy court, during a July 21, 1983 hearing, recognized that the
 

 fundamental issue is whether or not a Chapter 13 plan in which there is no debt, absolutely no debts, secured or unsecured, there is no dependency on regular income to do anything, and the only thing you are seeking is to reject an option agreement; and whether or not Chapter 13 provides a vehicle for doing that.
 

 
 *939
 
 The Congress, I just do not think, had that in mind in its creation of the Chapter 13 concept.
 

 Brief of Appellant at 9. We agree.
 

 [6]
 

 . The bankruptcy court discussed the good faith requirement and recognized that "[t]he application of the bankruptcy laws should only provide meaningful relief to a good faith debtor who is or may soon be financially distressed."
 
 Id.
 
 Surprisingly, the court then went on to permit the Waldrons to profit from the bankruptcy laws even though the Waldrons were a far cry from financial distress.
 

 [7]
 

 . In fact, under 11 U.S.C. § 109(e) (1982), “[o]nly ... an individual with regular income and such individual’s spouse ... that owe, on the date of the filing of the petition, noncontin-gent, liquidated, unsecured debts that aggregate less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000 may be a debtor under Chapter 13_” As Collier points out:
 

 [T]he language of section 109(e) is drafted explicitly to require that a chapter 13 debtor
 
 owe debts
 
 on the date that the petition is filed. However, while the debtor must owe some debts, he cannot owe debts in too large an amount and still expect to take advantage of the streamlined rehabilitative scheme provided in chapter 13.
 

 2 Collier on Bankruptcy § 109.05 (L. King 15th ed. 1979) (emphasis in original). In this case, the Waldrons owed no debts when they filed
 
 *940
 
 their petition. The bankruptcy court should have thus immediately examined the Waldrons’ motives and the attendant circumstances to determine, as we do here, that the Waldrons were not acting in good faith.
 

 [8]
 

 . The bankruptcy court also failed to examine
 
 In re Fast Food Properties, Ltd.,
 
 5 B.R. 539 (Bankr.C.D.Cal.1980). In that case, the bankruptcy court dismissed a Chapter 11 petition because it was filed solely to frustrate the enforcement of a power of sale provision under a deed of trust.
 
 Id.
 
 at 540. The Chapter 11 debt- or had "no unsecured creditors and only two secured creditors.”
 
 Id.
 
 The Waldrons are debt-free and filed their Chapter 13 petition solely to reject a binding option agreement.