**In re The CHARTER COMPANY, et al., Debtors.**

**Bankruptcy Nos. 84–289–BK–J–GP through 84–332–BK–J–GP and 85–1033–BK–J–GP.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

June 4, 1990.

James H. Post, Jacksonville, Fla., for debtors.

Fred H. Kent, Jr., Jacksonville, Fla., for claimant.

## MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon objection of the debtors to amended proof of Claim No. 4063, filed by Barteroil, S.p.A. The Court held hearings on January 11 and January 16, 1990, and upon the evidence presented, enters the following Memorandum Opinion:

## FACTS

Barteroil, S.p.A., ("Barteroil"), entered into a consulting agreement with Charter Oil Company ("Charter Oil") dated June 17, 1980, which was extended by letter agreement dated August 31, 1981. This contract retained Barteroil as a "general adviser and consultant ... on various business opportunities pertaining to petroleum ... affairs in Italy and in certain other areas of the world."

With respect to compensation, the consulting agreement, as amended, provided in relevant part:

2. *Compensation.* Charter [Oil] shall pay Barteroil for all services rendered by Barteroil, and in reimbursement for all costs and expenses incurred by Barteroil in performing such services, an annual sum of U.S. $140,000 payable in such manner as Barteroil may direct. In addition to this amount, Charter [Oil] shall pay to Barteroil:

(i) All reasonable sums for travel, hotel and entertainment expenses previously authorized by Charter [Oil] in performance of services under this agreement.

(ii) Such other sums as may be appropriate as consideration for consummated contracts or other beneficial business opportunities brought to Charter solely by Barteroil.

Charter Oil Company was the lead company, operating as a holding company of a group of subsidiaries engaged in the oil industry which was referred to as the Charter Oil Group. All the companies in the Oil Group reported to the President of Charter Oil. Charter Oil also had the responsibility for obtaining financing, determining all aspects of the sales, and establishing personnel policies.

Charter Oil and New England Petroleum Company (NEPCO), one of the members of the Charter Oil Group, had dealt with National Oil Corporation of Libya prior to 1982. NEPCO was a member of Carey Energy Group which was purchased by Charter during the first half of 1979.

Carey Energy owed to National Oil Company of Libya the approximate sum of $175 million dollars. In order for Charter Oil to purchase Carey Energy, it was necessary for it to stay the Bahamian liquidation proceedings of Carey Energy's subsidiaries by paying the three major creditors of those subsidiaries. National Oil Company of Libya was such a creditor and was paid pursuant to an agreement whereby Brega Petroleum Marketing ("BREGA"), the marketing subsidiary of the National Oil Company of Libya, would ship oil to Charter Oil, and would be paid a substantial premium per barrel over the market price until the debt was paid. Charter Oil fully paid the Carey Energy debt through this agreement in December 1980, and ceased doing business with BREGA.

Subsequent to December of 1980 and prior to the spring of 1982, Charter Oil's employees were under instructions from the Charter Company not to do business with Libya. In the early summer of 1982, Richard Bastien, President of NEPCO, asked management of Charter Oil to purchase oil products from BREGA. Charter approved this request and contacted Giuseppe Vicentini of Barteroil to arrange a meeting with Ahmed Ferjani of BREGA to purchase oil products.

Vicentini contacted Ferjani by telephone and telex. Vicentini met in Jacksonville

with the President of The Charter Company and confirmed Charter's willingness to do business with BREGA.

Upon returning to Rome, Vicentini initiated a series of telexes to Ferjani and associates seeking to arrange a meeting between Charter Oil and BREGA to discuss the purchase of oil. The telexes included the names of the Charter representatives: Bastien, Easterlin, and Arnold.

Ferjani contacted Arnold and arranged a meeting in the Bahamas on August 22, 1982. The three Charter representatives met with Ferjani and reached a tentative agreement to purchase crude oil from BREGA. Vicentini was neither advised of this meeting nor invited to attend.

After the meeting Arnold advised Vicentini of the status of the Libyan negotiations and of a meeting to be held in London on September 1, 1982, to finalize the agreements between Charter and BREGA for the purchase of crude oil.

Vicentini prepared documents concerning means of pricing the Libyan oil and went to London, expecting to participate in the negotiations. One of the Charter representatives met with Vicentini and received the documents prepared by him, but did not invite him to attend or participate in the meeting.

Vicentini returned to Rome two days later after conducting other business with Charter but did not learn that a contract with BREGA and Charter had been signed until October, 1982.

At the London meeting, Charter Oil Bahamas, Inc. ("COBI") and Charter Oil Bahamas, Ltd. ("COBL"), entered into agreements to purchase crude oil from Libya effective September 1, 1982. The contract was extended on December 15, 1982, with BREGA delivering 39,740,917 barrels of oil to the Charter Group from October 1, 1982, through January of 1984.

During his visit to Jacksonville in October, 1982, Vicentini was advised of the Libyan agreement from Alexander Zechella, the President of Charter Oil. Vicentini asked Zechella to investigate his company's rights to a commission in connection with the Libyan oil contracts. Zechella in turn requested Jim Francis, Executive Vice President, Operations of Charter Oil, to study the facts surrounding the Libyan contracts to determine if a commission was due Barteroil.

Francis concluded, based on memoranda from Bastien and Arnold, that Barteroil was not entitled to a commission.

Francis and Vicentini continued to correspond over the next year concerning Barteroil's entitlement to a commission. When The Charter Company and subsidiaries, including Charter Oil, filed Chapter 11 petitions in April, 1984, Barteroil filed a claim, subsequently amended, for commissions in the amount of $5,563,721, based on $.14 per barrel.

Debtor maintains that the telephone calls and telexes sent by Barteroil were done so in its consulting capacity, for which it was being paid $140,000 per year, and that this contact was not a "beneficial business opportunit[y] brought to Charter solely by Barteroil." The debtor also claims that it had an existing business relationship with Ferjani of the National Oil Corporation of Libya, and any contact by Vicentini with Ferjani was only for convenience.

Vicentini retorts that the peculiarities of dealing with Middle Eastern nationalized oil companies, mandates services such as those of Barteroil. Vicentini testified that the major reason Barteroil was engaged by the debtor was to have close, easy access to Ferjani.

Both sides failed to have Ferjani testify at deposition or hearing. Apparently the strained relations between the governments of the United States and Libya made such testimony impossible.

The testimony of experts at trial revealed that there is no easy standard for determining a commission in the oil industry. Evidence showed that there was a range of $.025 to $.25 per barrel, depending upon the relationship between the parties, and the size and duration of the transaction. This Court is convinced that a commission of approximately $.0125 per barrel

is reasonable in light of the facts of this case.

## DISCUSSION

■ The equitable powers of the bankruptcy court have been expressly recognized by the United States Supreme Court. *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). In that case the trustee sought an order holding the bank liable for its payment of checks drawn by the debtor before its bankruptcy but presented for payment after the filing of the bankruptcy petition. The trustee argued that the bank's payment of the checks was a "transfer," therefore avoidable by the trustee. The Supreme Court held that although a literal reading of the statute might suggest otherwise, it would be inequitable to make the bank liable to the trustee. The court held that there was "an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." 385 U.S. at 103, 87 S.Ct. at 277.

Several circuit courts have followed this principle:

> Essential to any analysis of the meaning and policy behind ... the Bankruptcy Code is the recognition that a bankruptcy court is a court of equity.

*In re Briggs Transportation Co.,* 780 F.2d 1339, 1343 (8th Cir.1986). *See also, In re Ranch House of Orange–Brevard, Inc.,* 773 F.2d 1166, 1169 (11th Cir.1985); *In re Mobile Steel Co.,* 563 F.2d 692, 698–99 (5th Cir.1977).

The cornerstone of the bankruptcy courts has always been the doing of equity. *In re Waldron,* 785 F.2d 936, 941 (11th Cir.), *cert. dismissed,* 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986); *In re Littleton,* 888 F.2d 90, 94 (11th Cir.1989) (quoting *Waldron, supra.*).

Bankruptcy courts have used their equitable powers in numerous factually different cases to ensure fairness and equity among parties. *See, In re Jarax Intern., Inc.,* 81 B.R. 715 (Bankr.S.D.Fla.1987) (bankruptcy court may use its equitable power to modify an attorney retaining lien for the protection of the debtor, trustee, and attorney); *In re Interstate Restaurant Systems, Inc.,* 61 B.R. 945, 948 (S.D. Fla.1986) (bankruptcy court not bound to rigidly adhere to procedural formalities and ignore the underlying equities); *In the Matter of Triangle Chemicals, Inc.,* 697 F.2d 1280 (5th Cir.1983) (bankruptcy court has the sound discretion to consider whether a nunc pro tunc order should be issued to validate a previous failure to obtain the requisite court approval).

This Court will exercise its equitable powers to bring this case to a fair and reasonable conclusion.

■ The parties to this dispute alternatively claim that the services of Barteroil had everything or nothing to do with the resulting contracts between the debtor and BREGA. The only witness who could offer this Court definitive evidence as to the role of Vicentini and Barteroil is Ferjani. However, due to the current state of international affairs, such evidence is not forthcoming. Thus, this Court must rely upon the evidence that was presented and fashion an equitable remedy.

It is undisputed that Barteroil, through the influence and efforts of Vicentini, had a direct effect on the debtor receiving a valuable contract. The dispute lies as to what the value for those services are. The Court concludes that the reasonable value of these services is $500,000.00, approximately $.0125 per barrel of oil.

## CONCLUSION

A separate order will be entered consistent with this Memorandum Opinion allowing the amended Claim No. 4063 of Barteroil, S.p.A., in the amount of $500,000.