**SOUTHTRUST MOBILE SERVICES, INC., Appellant,**

**v.**

**Scottie D. ENGLEBERT and Sandra D. Englebert, Appellees–Debtors,**

**C. Michael Stilson, Appellee–Chapter 13 Standing Trustee.**

**Civ. A. No. 91–AR–1631–W.**

United States District Court, N.D. Alabama, W.D.

Jan. 21, 1992.

Carlos E. Heaps, Heaps & Ramsey, Birmingham, Ala., for Southtrust Mobile Services, Inc.

Susan Ankenbrandt Mitchell, Birmingham, Ala., for Scottie D. Englebert and Sandra D. Englebert.

C Michael Stilson, pro se.

## MEMORANDUM OPINION

ACKER, District Judge.

SouthTrust Mobile Services, Inc., has appealed to this court from an order of the United States Bankruptcy Court for the Northern District of Alabama, BK No. 90–71300, denying SouthTrust's motion for relief from automatic stay, and simultaneously purporting to grant two conflicting motions, one by C. Michael Stilson, the Chapter 13 Standing Trustee, and the other by Scottie D. Englebert and Sandra D. Englebert, the debtors, for a modification of the debtors' Chapter 13 plan.

To a substantial degree, if not entirely, both the pertinent procedural facts and the pertinent substantive facts are undisputed. This is a good thing, because in this case transcripts of every hearing involving a dispute between SouthTrust and the Engleberts and/or the Trustee, as reflected in the record prepared by the Clerk of the bankruptcy court, are "Not Available Audio Tape Inaudible". Partly for this reason and partly because this court felt that dialogue with the lawyers would be helpful, the court held oral argument in addition to

its consideration of the briefs, and obtained agreement from the parties for some supplementation of the record.

Prior to the Engleberts' initial filing for Chapter 13 relief on June 15, 1990, South-Trust held (and still holds) a first lien on a mobile home which is the principal residence of the Engleberts. When they invoked Chapter 13, the Engleberts were current on their monthly payments to South-Trust and only sought to include their other creditors within the Chapter 13 payment plan. At that time the principal balance owed on the mobile home was $16,218.00 and the monthly payments were $234.31, which included principal, interest and insurance. In their original petition the Engleberts stated the market value of their home as $15,000.00, meaning that with a secured claim against it of $16,218.00, they had no "equity". As previously pointed out, the Engleberts' Chapter 13 plan as initially proposed and confirmed provided for payment through the court only to their *other* creditors, SouthTrust expressly to be paid directly by the Engleberts in accordance with the note and security agreement. South-Trust was in the original plan only in the sense that it was listed as a secured creditor in the petition. SouthTrust had no reason to object and did not object to the plan because its rights were in no way affected. On July 30, 1990, the plan was confirmed by the bankruptcy court.

The Engleberts subsequently became delinquent in their payments to SouthTrust, and on October 22, 1990, SouthTrust filed its first motion for a lift of the automatic stay. This motion was set for hearing on November 20, 1990, was continued to November 27, 1990, but before the November 27 hearing the Engleberts brought current their SouthTrust account, and SouthTrust withdrew its motion.

The Engleberts thereafter became delinquent again, whereupon on May 9, 1991, SouthTrust filed its second motion for a lift of the stay. This motion was set for hearing on June 4, 1991. On May 17, 1991, C. Michael Stilson, the Chapter 13 Standing Trustee, whose interest was and is not identical with that of the Engleberts, filed a motion seeking to amend the Engleberts' Chapter 13 plan to cure their post-confirmation default and arrearage and to provide for the payment of future mortgage payments of $203.31 per month (this figure was erroneous in that it did not include the insurance premium) through the plan by payroll deduction and transfer to South-Trust through the Trustee's account. This motion was not in the record as originally certified by the bankruptcy Clerk, but was referred to in the record and briefs. By agreement, the record was supplemented with the Trustee's said motion, plus an unfiled copy of the same motion, containing handwritten notations, along with a letter from the Trustee's counsel indicating that oral amendments were made by the Trustee during the hearing on June 4, 1991, i.e., noting the proper monthly amount to be paid to SouthTrust as $234.31 instead of $203.31 and noting an increase in the amount of the arrearage from $702.63 to "$1,171.55 plus L.C.", "L.C." meaning "late charge". Nowhere in the record is the amount of this late charge set forth. It could be $5.00. It could be $500.00. The amount could make a difference.

On May 22, 1991, SouthTrust filed a motion to strike the Trustee's motion, taking the position that the Trustee had no standing to file such a motion. SouthTrust's said motion was also not in the record, and still is not, but it is obvious that there was such a motion because the record reflects that it was denied. Although the Trustee's brief says that on May 28, 1991, the Engleberts themselves filed their own proposed amendment to the plan offering to cure their post-confirmation default, while not seeking, as had the Trustee, to include their future mortgage payments in the amended plan to be managed by and through the Trustee, the said debtors' motion, like the others, was also not in the record as certified. The supplement to the record requested by the court reflects that a motion by the Engleberts, using a printed form entitled "Amendment to List of Creditors", although not actually stamped "filed" by the bankruptcy court until June 14, 1991, was "dated" May 13, 1991, and also contained a conditional recommenda-

tion signed by the Trustee on June 3, 1991, said recommendation being consistent with the Trustee's own separate motion. Nowhere in this "Amendment to the List of Creditors" does the date May 28, 1991, appear. Where this date comes from is an unimportant mystery. This court deduces, rightly or wrongly, that the "Amendment to List of Creditors" reflects that at least something like it was communicated to the bankruptcy court by the debtors' attorney on or shortly before June 4, 1991, before the bankruptcy court ruled. The debtors' motion sought an increase in Mr. Englebert's bi-weekly payroll deduction from $115.00 to $160.00, whereas the Trustee's motion sought an increase from $115.00 to $262.00. The debtors' motion sought a fixed monthly payment of $50.00 toward the SouthTrust arrearage, whereas the Trustee's recommendation was a fixed payment of $20.00 per month toward this arrearage. In other words, the two proposed amendments to the plan were materially different. The Trustee proposed one thing. The Engleberts proposed another.

It was the Trustee's proposal which prevailed. On June 4, 1991, the bankruptcy court heard argument on the various pending motions. The court took no testimony, hearing only from the Trustee, from the lawyer representing the debtors, and from the lawyer representing SouthTrust. The recording device failed, so there is no official record of the proceeding. What record there is had to be reconstructed by order of this court so that this court could undertake a rational review of the result. This reconstruction of what transpired on June 4, 1991, was prepared by counsel for the Engleberts. Neither counsel for the Trustee nor counsel for SouthTrust objected to or asked to supplement the Engleberts' counsel's rendition of what took place. That rendition reflects that no one except the Trustee and two lawyers spoke, after which the following occurred:

Judge Wright ... ruled as follows:

a. Denied SouthTrust's motion; to which Carlos [Carlos Heaps, counsel for SouthTrust] Objected, Judge then advised him that he could appeal;

b. Granted the Standing Trustee's Motion for Amendment and the Debtor's [sic] amendment and increased the payment to $262.00 per pay period.

c. The hearing then ended.

This reconstruction says nothing about what, if anything, the court ruled as to the SouthTrust arrearage. From the fact, learned by the persistence and insistence of this court, that the Trustee had recommended that a "fixed payment in the amount of $20.00 per month be allowed on said postpetition arrearage", and the further fact that the bankruptcy court on June 4, 1991, granted the Trustee's recommendation, this court deduces that the bankruptcy court on June 4, 1991, confirmed a modification to the effect that $20.00 per month must be paid toward the arrearage which turned out to be $1,171.55 instead of the $702.63 which both the Trustee and the debtors averred to have accrued when the Trustee filed his motion and recommended an arrearage reduction of $20.00 per month. A purported order entered by the bankruptcy court on July 3, 1991, long after this appeal was filed, provides for $30.00 per month toward the arrearage instead of $20.00, but this court can find nothing to this effect in the record which preceded the appeal. Therefore, this court necessarily concludes that the $10.00 increase in the monthly payment toward the arrearage was a post-appeal afterthought. There is no other explanation justified by the record. This court deduces by the use of simple arithmetic that the bankruptcy court probably realized after the appeal was taken that $20.00 per month would not pay off the arrearage within the time remaining in the plan, while $30.00 per month would accomplish the needed result. In other words, a critically important action was taken by the bankruptcy court *after* an otherwise defective order was on appeal.

On June 11, 1991, within the ten (10) day period beginning on June 4, 1991, as provided by Bankruptcy Rule 8002(a), SouthTrust took the advice expressly given it by the bankruptcy court and filed its notice of appeal. On that same day the Clerk of the

bankruptcy court gave the following written notice to the parties:

Pursuant to Rule 8004, Rules of Bankruptcy Procedure, the undersigned Bankruptcy Clerk gives notice to counsel of record for the Appellee that Notice of Appeal under Rule 8001 was filed with the Bankruptcy Clerk's Divisional Office on June 11, 1991 and the Appellant is notified to comply with Rule 8006 requiring the designation of the contents for inclusion in the record on appeal and a statement of the issues he intends to present on the appeal, including the findings of fact, conclusions of law, and orders entered thereon, and any other papers Appellant or Appellee deem necessary to be included in the record on appeal.

All parties are further notified that should they wish to include a transcript of the evidence or proceedings, or any part thereof, that they should make satisfactory arrangements for payment of its costs.

DONE this 11th day of June, 1991.

WILLIAM C. REDDEN, CLERK

In this notice, which was required by Bankruptcy Rule 8004, the Clerk obviously did not, because he could not, require the appellant to designate anything that did not then exist, so when on June 17, 1991, SouthTrust filed its designation of the record, it did not, because it could not, designate a purported "memorandum of decision" or "order" not "filed" by the bankruptcy court until July 3, 1991. Rule 8006 also requires that an appellee may designate items to be included in the appeal record within seven (7) days after the appellant's designation. This means that by June 24, 1991, the appellate record was closed, and the bankruptcy Clerk could not certify anything else. The parties' joint motion and/or this court's concurrence or request was thereafter required for any supplementation to the appellate record.

On July 2, 1991, twenty-one (21) days after the appeal which had lifted the jurisdiction of the bankruptcy court, and one (1) day before the so-called "memorandum of decision" and "order" were filed, the Stand-ing Trustee graciously and gratuitously, without SouthTrust's request or permission, filed a proof of claim on behalf of SouthTrust for the monthly mortgage payment. On July 9, 1991, the Trustee just as gratuitously filed for SouthTrust a proof of claim for the arrearages. The Trustee had earlier decided what the debtors needed to do and now he was deciding what the creditors needed to do. In both cases he did it for them. The Trustee acted as roving uninvited ambassador for both sides.

On July 3, 1991, twenty-two (22) days after the appeal, the bankruptcy court filed its purported "memorandum of decision" and "order" which, for aught appearing, would never have been written and filed but for the filing of this appeal. The last line of this "memorandum of decision" says:

This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The bankruptcy court could not justify or insert into the record an after-the-appeal opinion by reference to Rule 7052, which expressly applies *only* to an adversary proceeding, something this proceeding was not. *In re Shariyf*, 68 B.R. 604 (E.D.Pa. 1986), makes clear that Rule 7052 does not require specific findings and conclusions in ruling on a motion for relief from the automatic stay filed by a creditor seeking the right to foreclose, because such a proceeding is not an adversary proceeding. Rather, such a proceeding is simply a contested matter. There is nothing in this record to give any indication that on June 4, 1991, the bankruptcy court attempted to reserve a right at some later time of its choosing to issue a formal opinion. As stated, Bankruptcy Rule 8006 requires that within ten (10) days after appellant files the notice of appeal "appellant shall file with the Clerk of the bankruptcy court and serve on the appellee a designation of items to be included in the record on appeal and a statement of the issues to be presented". This is exactly what SouthTrust did. Also, as already pointed out, Rule 8006 provides that appellee shall have seven (7) days to designate other matters to be included in the record. Under the circumstances it would

not have been possible for SouthTrust, or for the Engleberts, or for the Trustee, timely to designate the "memorandum of decision" which did not exist until it suddenly appeared on July 3, 1991, together with the purported accompanying "order", largely, if not exactly (because of the jump from $20.00 to $30.00), repetitive of what the bankruptcy court had ordered on June 4, 1991. As far as this reviewing court is concerned, the purported order and opinion of July 3, 1991, are due the same consideration as briefs would be. They are not in fact part of the "record", especially when no party has moved to supplement the record with them. Although Bankruptcy Rule 8006 does provide that "the record on appeal shall include the items so designated by the parties, the notice of appeal, the judgment, order, or decree appealed from, *and any opinion, findings of fact, conclusions of law of the court*" (emphasis supplied), the word "opinion" necessarily and logically refers to any opinion *that antedated the appeal*. This court can find no authority for an after-the-appeal opinion by the court, whether it simply repeats or adds to findings already orally made and shared with the appellant, and upon which the appellant has already based the appeal. When the bankruptcy court on June 4, 1991, told SouthTrust it could appeal, the court, in effect, conceded that Rule 7052 did not apply.

If *written* findings of fact and conclusions of law had been a prerequisite to an appeal, the appeal taken on June 11, 1991, would have been premature and would be totally ineffectual. Neither appellee/debtor nor appellee/Trustee has filed a motion to dismiss the appeal as premature. If such a motion had been filed it would have been denied.

Why the Clerk of the bankruptcy court waited until July 16, 1991, to file the record with this court, and why he included in the record the belated purported opinion and order of the bankruptcy court, are unexplained unless by the fact that the Clerk's notice appears on the letterhead of the bankruptcy judge himself.

The Clerk's "statement of the issues" is as follows:

1. Does the stay of section 362 of Title 11 apply to payments which come due after the petition is filed.
2. Is the mobile home, the subject of this appeal, property of the bankrupt estate.
3. Whether the Bankruptcy Court erred in amending the Order of Confirmation to include in the Debtor's plan postpetition payments not paid to Creditor by debtor.
4. Whether 11 U.S.C. Section 1322(b) permits the debtor to include in his Chapter 13 plan post-petition payments which the debtor has failed to pay post-petition when and as the same came due.
5. Whether Creditor is entitled to relief from the automatic stay for lack of adequate protection.
6. Whether the debtor's failure to comply with a plan as proposed and confirmed show bad faith on the part of the debtor.
7. Does the amended plan violate the provisions of 11 U.S.C. Section 1329(c).

DONE this 16th day of July, 1991.

WILLIAM C. REDDEN, CLERK

This court does not agree with the bankruptcy Clerk's statement of the issues, which he undoubtedly borrowed from SouthTrust. The Clerk's statement does contain some of the issues expressly or implicitly addressed by the bankruptcy court on June 4, 1991. Yet, it does not contain some of the issues purportedly spoken to in the after-the-appeal "memorandum of decision". No one could have known at the time the notice of appeal was filed that these particular seven issues had been ruled upon by the bankruptcy court, that is, except to the extent that they, or some of them, may have been implicit in the denial of relief from the stay and in the oral granting of conflicting motions for a modification of the plan. It is a luxury which a trial court does not enjoy enigmatically to make a final order, whether oral or written, suggest correctly that it is ripe for appeal, and thereafter, only when an ap-

peal is taken, write an opinion undertaking to justify the ruling, especially when the trial court has made no attempt to reserve such a right.

### Conclusions of Law

█ This court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a). Just as an appeal from a district court to a court of appeals divests the district court of jurisdiction except for the purpose of enforcing its final decree, the filing of the notice of appeal by SouthTrust on June 11, 1991, divested the bankruptcy court of jurisdiction over the subject matter of the appeal. *In re Air Vermont, Inc.,* 47 B.R. 536 (Bankr.D.Vt.1985). Therefore, as previously stated, this court must consider this appeal on the record as of June 11, 1991 (or as of June 24, 1991, the last day upon which a designation was permitted), with the supplements authorized by this court.

Using the reconstructed transcript of what occurred on June 4, 1991, and the supplements requested, together with this court's limited powers of deduction, including the logical inferences prompted by the briefs, and sometimes assuming that facts asserted in a brief and not contradicted by another party are true even if not in the record, this court concludes that the bankruptcy court on June 4, 1991, (1) denied SouthTrust's motion for relief from the stay; (2) overruled SouthTrust's motion to strike the Trustee's motion for modification; and (3) granted the Trustee's orally amended motion to amend the plan. Although the bankruptcy court orally said that it was also granting the motion of the debtors, the bankruptcy court did not grant relief in the terms sought by the debtors. Therefore, the bankruptcy court could only have granted the motion of the Trustee, which ultimately sought an increase in Mr. Englebert's bi-weekly payroll deduction to $262.00, with all mortgage payments to SouthTrust, including $20.00 per month reductions in the arrearage, to be made through the Trustee. Counsel for the debtors, with the consent of this court, supplemented the record with a post-appeal deduction order of July 3, 1991, the same day as the "memorandum of decision", indicat-

ing that the actual bi-weekly deduction now being withheld by Mr. Englebert's employer is $171.00 bi-weekly, rather than the $262.00 ordered by the bankruptcy court on June 4, 1991. This marked difference was unexplained in the record prior to oral argument, a fact which tends to support the post-appeal representation that, without any notice to SouthTrust, Mr. Englebert's bi-weekly payroll deduction was reduced *after* the appeal was taken, when the family automobile was returned to, or was repossessed by, the auto lender. The increase of the monthly payment toward the arrearage of $20.00 to $30.00 also was apparently without notice to SouthTrust. Why the Engleberts and the Trustee were willing to give up the automobile but not the mobile home and why they were willing to increase the arrearage payment are nowhere discussed. But for this appeal, SouthTrust would surely have had a "due process" right to participate in the judicial consideration of additional changes in the plan as significant as a substantial reduction in the bi-weekly payroll deduction and an increase in the arrearage payment. If the payroll deduction had remained $262.00 as ordered in the June 4, 1991, order, and if the entire difference between $262.00 and $171.00 had been applied to SouthTrust's arrearage, that arrearage would have been substantially reduced, if not wiped out, by now.

To the extent the facts found by the bankruptcy court can be deduced from the supplemented record, they must be accepted by this court unless clearly erroneous. *Federal Land Bank of Jackson v. Cornelison,* 901 F.2d 1073 (11th Cir.1990). Bankruptcy Rule 8013 recognizes that "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witness". In this case this rule cannot apply, *because there were no witnesses.* This level of any deference given to findings of fact is, of course, not extended to the bankruptcy court's conclusions of law, which are reviewed *de novo. In re Sublett,* 895 F.2d 1381 (11th Cir.1990).

Although the "statement of issues" by the bankruptcy Clerk is not gospel, the

court will mention the seven purported issues, although not in the order they were listed by the Clerk. Instead, this court will address the issues in the reverse order of their significance to this appeal, as this court sees them. Some could, and perhaps should, be ignored entirely, but they will at least be acknowledged. The court will use the numbers assigned the issues by the bankruptcy Clerk.

1. Does the stay of section 362 of Title 11 apply to payments which come due after the petition is filed.

■ If SouthTrust had truly believed that the automatic stay did not apply to the payments being made to it by the Engleberts outside of the original Chapter 13 plan, it would simply have begun foreclosing on its security when a default occurred. It was correct in not doing so, because the automatic stay provided by 11 U.S.C. § 362 does apply to the collection of post-confirmation payments on any debt, secured or not, whether mentioned in the plan or not, if the debt precedes the filing of the Chapter 13 petition and the creditor was named in the petition.

2. Is the mobile home, the subject of this appeal, property of the bankrupt estate.

■ It is a diversionary exercise to answer this question. The Engleberts' mobile home, even though the debtors had questionable "equity", was and is technically the property of their bankruptcy estate and therefore was subject to the jurisdiction of the bankruptcy court. Although this court agrees with *Matter of Thomas*, 91 B.R. 117 (N.D.Ala.1988), *aff'd sub. nom*, *In re Thomas*, 883 F.2d 991 (11th Cir.1989), cited by SouthTrust, this court distinguishes that case by agreeing with the bankruptcy court here that this particular mobile home was, in fact and law, the Engleberts' principal residence, because it was affixed to the ground. It was not mere personalty. This finding by the bankruptcy court is consistent with *Ala.Code* § 6–10–2 (1984), which was amended in 1980 expressly to provide that a mobile home enjoys the protection of Alabama's homestead exemption from levy and attachment proceedings. *In re Thomas* held that "Alabama is a title theory state", but in *In re Thomas* the sales contract expressly provided that the mortgagee-lender would retain title to the mobile home while the mortgagor-borrower held possession. Assuming that *In re Thomas* would otherwise have relevance here, under the extant circumstances it loses that relevance when it is recognized that the particular sales contract here contains no provision by which SouthTrust purports to retain "title". The copy of the application for title attached to the Trustee's brief, not contradicted by either of the other parties, lists the Engleberts as the *"owners"* and SouthTrust as a *"lienholder"*. This paper was the proper vehicle for perfecting a security interest under *Ala.Code* § 32–8–61 (1989), and the bankruptcy court properly found SouthTrust perfected. As far as this court is concerned, 11 U.S.C. § 1322(b)(2), which provides that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence" applies here, as the bankruptcy court assumed. SouthTrust has nothing but a classic security interest in this principal residence. The bankruptcy court at different times correctly referred to this mobile home as "residence", "family residence", "mobile home residence" and "family home". The bankruptcy court obviously was influenced by its correct assumption that this was principal residence and not simply personal property. This appears to be the fact, more than any other fact, that dominated the bankruptcy court's thinking.

During the oral argument before this court, it was asserted for the first time that the Engleberts' mobile home is located on real property that the debtors rent from a third party, but there is nothing in the record to indicate that this is a fact. No such contention or proof was offered to the bankruptcy court. And the debtors' list of creditors does not include anyone recognizable as a landlord. Thus, the bankruptcy court was, and this court is, free to give no

significance to any difference in ownership as between the mobile home and the ground upon which it is located. If this was to be important, it was not properly raised or presented.

Of course, if SouthTrust is correct in its assumption that *In re Thomas* is applicable to this mobile home and is controlling in answering question No. 2, this question would become the dispositive question, would be answered against the bankruptcy court, and the case would be decided in favor of SouthTrust.

3. Whether the Bankruptcy Court erred in amending the Order of Confirmation to include in the Debtor's plan post-petition payments not paid to Creditor by debtor.

This court is not sure that it understands this question, any more than it fully understands the procedure by which the Chapter 13 plan was amended on June 4, 1991. The plan as last modified provides that the regular monthly mortgage payments to South-Trust be made through the Trustee. This was done at the sole suggestion of the Trustee. It was directly contrary to the suggestion of the debtors. In fact, as previously mentioned, the debtors themselves only suggested a bi-weekly payroll deduction of $160.00 which is even less than the present $171.00. The amount of the monthly payment to SouthTrust outside the plan already was $234.31, so that question No. 3 cannot be intended to ask whether the rights of this creditor have been materially altered. It must, instead, be whether the modification could come in response to a motion filed by the Trustee, as contrasted to a motion by the debtors. This seems to be what the argument was about in the bankruptcy court. The fact that the bankruptcy court denied SouthTrust's motion to strike the Trustee's motion and granted the modification requested by the Trustee, as orally modified at the hearing, necessarily means that the bankruptcy court found that the Trustee had standing to move for the modification. This whole issue, if this court construes it correctly, has become moot, because SouthTrust conceded during oral argument that 11 U.S.C. § 1329(a) now expressly permits the Trustee as well as the debtor to request a Chapter 13 plan modification. This tempest is thus relegated to its teapot.

5. Whether Creditor is entitled to relief from the automatic stay for lack of adequate protection.

■ Although prior to the perfection of the appeal on June 11, 1991, the bankruptcy court made no express finding about the "adequacy of protection" afforded South-Trust, such a finding was perhaps implicit in its refusal to lift the stay and in its approval of the Trustee's proposal. Assuming such an implicit finding, the question here is whether SouthTrust, as a matter of law, was adequately protected by an increase of the bi-weekly payroll deduction to $262.00, out of which $234.31 per month was to constitute the regular mortgage payment and $20.00 per month was to be used to reduce the dramatically accelerating arrearage, which included a "late charge", the amount of which cannot be ascertained from the record. Also, there was no evidence offered on June 4, 1991, and nothing in the record in regard to the possible diminution in the fair market value of the mobile home by virtue of wear and tear, natural or otherwise. Only by finding it possible for the bankruptcy court to increase the monthly arrearage payment from $20.00 to $30.00 *after the appeal* can the plan become feasible, if feasibility and "adequate protection" have any connection. Using simple arithmetic, this court cannot, *on this somewhat slim record,* find the bankruptcy court's implicit finding of "adequate protection" clearly erroneous, although the post-appeal decrease in the bi-weekly deduction from $262.00 to $171.00, and the unexplained post-appeal increase in the monthly arrearage payment from $20.00 to $30.00, leaves this court with considerable doubt, and somewhat confused. If this court manifests confusion, it simply joins the other members of the cast. This court expresses its doubt because "adequate protection" requires that the secured party be guaranteed that it timely realize the indubitable equivalent of its in-

terest, meaning the whole value of its bargained-for rights. *See* 11 U.S.C. § 361(3); *In re Rhoades,* 38 B.R. 63 (Bankr.D.Vt. 1984).

7. Does the amended plan violate the provisions of 11 U.S.C. Section 1329(c).

Section 1329(c) of Title 11 provides that a modified plan may not allow payments to exceed a period more than three years after the time the first payment became due under the plan as originally confirmed, unless the court, for good cause, approves a longer period not to exceed five (5) years. Here, the original plan as confirmed on July 25, 1990, was for five (5) years. The amended plan as approved on June 4, 1991, did provide for sufficient deductions which, if complied with precisely, would require the Engleberts to take care of all of their scheduled obligations, except for the South-Trust arrearage, within the remaining forty-eight (48) month time frame of their plan. But $20.00 per month toward the arrearage, as contained in the plan approved on June 4, 1991, and from which this appeal was taken, would not suffice to pay the arrearage in time. Only if an appellate court can tolerate a lower court's post-appeal alteration in the final order being reviewed, can this plan be found to comply with § 1329(c). If appellees had

sought a remand for the limited purpose of allowing the amendment from $20.00 to $30.00 this court would have granted it, but no such motion was filed. Because there are other dispositive questions, the court will not treat this error as fatal because it could be corrected on remand.

4. Whether 11 U.S.C. Section 1322(b) permits the debtor to include in his Chapter 13 plan post-petition payments which the debtor has failed to pay post-petition when and as the same came due.

■ This is the dispositive question in this case. It was posited as follows by the bankruptcy court itself in its post-appeal brief, called a "memorandum of decision":

May a confirmed Chapter 13 plan be modified to include a post-petition arrearage on a mortgage of the debtor's home?

The bankruptcy court expressed no doubt whatsoever about how to answer its question, citing as authority, *inter alia, In re Stafford,* 123 B.R. 415 (N.D.Ala.1991), and expressly rejecting *In re Hollis,* 105 B.R. 1003 (N.D.Ala.1989). The bankruptcy court understandably did not cite Judge Pointers' opinion in *Central Bank of the South v. Thomas,* No. CV–90–P–2337–W (N.D.Ala. January 16, 1991), a similar case in which Judge Pointer cited *Hollis.*[1]

---

1. Judge Pointer wrote:

The bank argues on appeal that (1) prior case law of a court in this district directs that post-confirmation defaults on a residential mortgage cannot be cured by modification of a Chapter 13 plan [1] [*In re Hollis,* 105 B.R. 1003, 1007 (N.D.Ala.1989) ] and (2) the bank has established that it is entitled to relief from the stay under 11 U.S.C. § 362(d). Without deciding whether a plan modification under 11 U.S.C. § 1329 is the proper vehicle for curing a default on a debt which was not made part of the debtor's original plan, the court concludes that under the applicable modification standards it was error for the bankruptcy court to modify the plan in this case to allow a cure of the defaulted mortgage.

Section 1329 of the code controls the modification of plans after confirmation. However, any modification pursuant to § 1329 is subject to the provisions of § 1322, which describes the contents of a Chapter 13 plan. *See* 11 U.S.C. § 1329(b)(1). Section 1322(b)(5) applies to long-term debt of the

type at issue here: a mortgage debt on the residence of the debtor. *See* 5 Collier on Bankruptcy § 1322.09[1]. Pursuant to § 1322(b)(5), the plan may "provide for the curing of any default *within a reasonable time and maintenance of payments while the case is pending* on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due[.]" 11 U.S.C. § 1322(b)(5) (emphasis added).

The bankruptcy court noted that a modification may be proper where a change in the debtor's circumstances renders her unable to comply with the terms of the original plan. The bank contends, and this court agrees, that the evidence in the record does not disclose such a change in Thomas' circumstances. The bankruptcy court referenced a "downward economic spiral" of Thomas' family, perhaps occasioned by Richards' alleged drug use. However, there is no evidence in the record that Thomas furnished Richards with any support—the Chapter 13 statement filed

In its post-appeal "memorandum of decision", the bankruptcy court undertook to explain itself as follows:

> Despite the clarity of the statutory language and the explicit policy goals Congress has articulated for the Bankruptcy Code, there is some division among the trial courts of the bankruptcy system on the issue.... However, the majority and the better view is that a Chapter 13 debtor may cure a post petition default on a home mortgage under his/her plan.
>
> \*  \*  \*  \*  \*  \*
>
> This court once again elects to hold with the majority view that a post-petition arrearage on a debtor's home mortgage may be cured by modification of the Chapter 13 plan.

As stated, the bankruptcy court correctly found that the Engleberts' mobile home was their principal residence, despite some of the lawyers' expressions of surprise on this subject during oral argument, but the bankruptcy court may not be correct in its claim that its view on the subject of home mortgages in Chapter 13 cases constitutes "the majority view". A careful count of the decisions on the subject at hand, something this court has not undertaken, may demonstrate otherwise. *See In re Quinlan,* 12 B.R. 516 (Bankr.W.D.Wis.1981); *Matter of Bosteder,* 59 B.R. 878 (Bankr. S.D.Ohio 1986); *In re La Brada,* 132 B.R. 512 (Bankr.E.D.N.Y.1991); *In re Moran,* 121 B.R. 879 (Bankr.E.D.Okl.1990); *In re Bellamy,* 132 B.R. 810 (D.Conn.1991); *In re Witomski,* 126 B.R. 205 (Bankr.D.Md.

1990); *In re Hilton,* 122 B.R. 138 (Bankr. M.D.Fla.1990); and *In re Clark,* 133 B.R. 123 (Bankr.N.D.Ill.1991). One court of appeals, although in a "liberal" group (to which the bankruptcy court here being reviewed does not yet belong) that now allows a bifurcation and different treatment of the so-called "secured" and "unsecured" portions of an indebtedness on a residence in Chapter 13 cases, has recently conceded, contrary to the belief voiced by this bankruptcy court, that a Chapter 13 plan cannot be used to modify the terms of the "secured" portion of such a debt. *In re Hart,* 923 F.2d 1410 (10th Cir.1991). If such a bifurcation rule had been applied by the bankruptcy court here, the "secured debt" could not exceed the $15,000 market value of the mobile home, so that the amount of the debt exceeding $15,000 could be dealt with as any unsecured debt. The persuasive expression of one other appellate court is worth mentioning. Although dealing with § 1322(b)(5), the Ninth Circuit in *In re Harlan,* 783 F.2d 839 (9th Cir.1986), flatly held that a Chapter 13 plan cannot be employed to modify the terms of a promissory note secured by the debtor's principal residence and that there is no excuse for not recognizing the secured creditor's entitlement to relief from the automatic stay when such a debtor is in default. The distinction between the modification of the terms of the security agreement and a modification of the plan to affect the rights of the secured party is hard to understand.

This court is not persuaded, much less bound, by what a majority of other courts

at the inception of her case does not include as income any support from Thomas. A pattern of default on the mortgage debt was established as early as June 1987—just prior to the time Thomas filed her petition. Transcript of Bankruptcy Hearing at 18. That pattern continued throughout the pendency of Thomas' case. On three occasions Thomas opposed the bank's attempts to life the stay in Richards' case, and asked the court for opportunities to bring the payments current. A continuous liability to keep the payments current does not constitute a "change" in circumstances which warrants plan modification.

The facts of this case further establish that the plan modification could not comply with the requirements of § 1322(b)(5). That section directs that the regular monthly mort-

gage payments be maintained during the term of the plan. The evidence plainly illustrates Thomas' inability to do so. Section 1322(b)(5) also directs that any default be cured within a reasonable time. The bankruptcy court gave Thomas ample opportunities to cure the defaults on the mortgage when she opposed the bank's motions in Richards' case.

\*  \*  \*  \*  \*  \*

The court concludes that the plan modification in this case does not comply with the requirements of 11 U.S.C. §§ 1322(b)(5) and 1329, and the decision of the bankruptcy court is therefore due to be reversed.

*Central Bank of the South v. Thomas,* CV–90–P–2337–W (N.D.Ala.), Opinion of January 16, 1991, at 3–5.

may think on this subject, that is unless those courts include either the Eleventh Circuit or the Supreme Court. Until this court finds out what the Eleventh Circuit or the Supreme Court believes on this subject, this court will continue to think for itself, as it did in *Hollis,* a decision from which it sees no reason to retreat. Acknowledging, of course, that this court may be wrong, this court again finds what it said, and the authorities it cited, in *Hollis* more persuasive than *Stafford,* particularly inasmuch as Judge Pointer in *Central Bank, supra,* also recognizes a reasonable limit upon how many times a home lender's secured rights can be "adjusted" over its objection by the modification of a Chapter 13 plan to fold in an arrearage and to provide for the payment on "time" of the arrearage by a newly devised schedule. According to the reasoning employed by the particular bankruptcy court here being reviewed, the court in a Chapter 13 case has a discretion that is virtually unlimited, if limited at all, to order arrearages on a home mortgage to be included in the plan and altered from time to time, even after the debtor defaults, and defaults, and defaults.

On June 4, 1991, the bankruptcy court pointed out to SouthTrust its right to appeal to this court. This court points out to the Engleberts and to the Trustee that they, too, have the right to appeal from this court to the Eleventh Circuit.

6. Whether the debtor's failure to comply with a plan as proposed and confirmed show bad faith on the part of the debtor.

■ This question posed by the bankruptcy Clerk was never discussed by the bankruptcy court, either before or after the appeal. Insofar as the record reflects, the issue was never presented or argued before the bankruptcy court. It is the first or second most important question in the case. The question was argued in briefs as if it were outcome determinative. Appellees are necessarily assuming that, despite no actual expression on the subject from the bankruptcy court, a finding of "good faith" was implicit in the bankruptcy

court's denial of relief from the stay and in its confirmation of the altered plan recommended by the Trustee. During oral argument before this court it was conceded by appellees that "good faith" is a prerequisite to the confirmation of any Chapter 13 modification, because

(a) The court shall confirm a plan if—

\*　　\*　　\*　　\*　　\*　　\*

(3) the plan has been proposed in good faith . . .

11 U.S.C. § 1325(a)(3).

This statutory language has not been changed since November 6, 1978, its effective date. When, on July 10, 1984, Congress amended 11 U.S.C. § 1329(a) to permit the Trustee as well as a debtor to request that a previously confirmed Chapter 13 plan be modified, Congress for some reason, probably inadvertence, did not amend § 1325(a)(3). Using the rules of English grammar, it is the "good faith" of the *proposer* of a plan modification that is the proper subject for inquiry. In this case, Mr. Stilson proposed the change in the plan as any change was actually confirmed. There is nothing in the record to demonstrate that the *debtors* were the authors of the proposal. Therefore, it logically should be the Trustee's "good faith" which should be under examination if any "good faith" is involved. This is not, however, the inquiry which the parties have conducted in their briefs, or which the bankruptcy Clerk suggests as an appropriate question for this court to answer.

Because the Trustee's interest is not identical with that of the debtor in a Chapter 13 case, whether a Trustee's proposal is made in "good faith" is an entirely different question from whether or not some different proposal made by the debtor is in "good faith". Because the Engleberts' substantially different proposal put forward on or about June 4, 1991, was not confirmed as an amendment to their plan, their personal "good faith" or lack of it need not be decided. It would be no more than an interesting academic exercise. If Congress had intended that the "good faith" of the Trustee be a subject for in-

quiry, dispositive on the question of whether to confirm *his* plan, this court will wait for some higher court to instruct the lower courts to conduct such an inquiry. This court need not, and will not, examine Mr. Stilson's personal "good faith" *sua sponte.*

■ Assuming *arguendo* that the Trustee in this case became the surrogate or unasked-for representative of the debtors, and that his plan, vicariously or by operation of law, became the plan of the debtors, thus implicating the "good faith" of the debtors in proposing the plan modification which they clearly did not devise, this court necessarily begins with a presumption in favor of the bankruptcy court, *if* it found, by implication (since it made no express findings), that the debtors' proposal under *respondeat superior* principles was made in "good faith". Such a presumption does not end the inquiry in a case where the bankruptcy court made no findings whatsoever with respect to the various factors set forth in *In re Kitchens,* 702 F.2d 885 (11th Cir.1983). In *Kitchens* the Eleventh Circuit enunciated the means for evaluating "good faith". Just as the Eleventh Circuit will reverse a district court if it does not at least mention the several factors necessarily involved in the fixing of a prevailing party's attorney's fee under 42 U.S.C. § 1988, this court, as an appellate court, cannot confirm a bankruptcy court's "implicit" finding of "good faith" when that court did not mention, much less discuss, a single *Kitchens* factor, or state any rationale for determining "good faith". Under the circumstances, the bankruptcy court is not to be presumed correct, particularly in light of the Supreme Court's recent expression in *Johnson v. Home State Bank,* —— U.S. ——, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), wherein that court, while holding that there is no absolute, statutory prohibition against the so-called Chapter "20" (a Chapter 13 trailing a Chapter 7), said:

> Because the lower courts never addressed the issues of Johnson's *good faith* or the plan's feasibility, this Court declines to address those issues and leaves them *for consideration on remand.*

111 S.Ct. at 2152.

It is unclear whether the Supreme Court meant for the Tenth Circuit, the lower court to which the writ of certiorari was directed, or the next-lower court, i.e., the district court, or the lowest court, i.e., the bankruptcy court, to determine on remand the question of the debtor's "good faith", although it is quite clear that the case was actually *"remanded"* only to the Tenth Circuit. What is also clear from *Home State Bank* is that the Supreme Court does not believe that a bankruptcy court's modification of a debt secured by a principal residence *automatically* includes or implies a finding that the proposal was made in "good faith". To the contrary, the Supreme Court is clearly saying in *Home State Bank* that the question of "good faith" is a question of ultimate fact or of law, very possibly for decision by an appellate court without any presumption of correctness in favor of the lower court's finding. This may throw into question the holding of the Eleventh Circuit in *In re Saylors,* 869 F.2d 1434 (11th Cir.1989), that "whether a Chapter 13 plan has been proposed in good faith is a finding of fact [by the bankruptcy court] reviewable under the clearly erroneous standard". 869 F.2d at 1438. *Saylors* is clearly distinguishable from the instant case because the bankruptcy court there being reviewed (which happens to have been the same court being reviewed in this case) actually mentioned the *Kitchens* factors, whereas here it did not. *Id.*

Not only did the bankruptcy court in the present case not mention any of the *Kitchens* factors, but the court heard no live testimony whatsoever, so it had no opportunity to evaluate demeanor or to assess credibility. This court does not fault the bankruptcy court for not taking testimony, because demeanor has little to offer in a case where the undisputed facts speak for themselves. When findings and conclusions are based solely on argument of counsel and on the pleadings and written materials, the trial court's findings are due no deference on appeal. The bankruptcy

court here was dealing with debtors who had failed, as in *Central Bank* and in *Hollis*, to comply with their own previously confirmed plan. As noted, if "good faith" is an inevitable complement to the approval of an amendment to a Chapter 13 plan, there would have been no reason for the Supreme Court expressly to remand in *Home State Bank* for a determination of the "good faith" question.

Some bankruptcy courts seem irresistibly tempted to find that almost any suggested modification of a failed Chapter 13 plan was proposed in "good faith" if it has the effect of saving the homeplace. Some bankruptcy courts are less susceptible to this temptation than others. In *In re Jackson*, 108 B.R. 251 (Bankr.E.D.Calif.1989), without the 1991 prompting of *Home State Bank*, that bankruptcy court found that the Chapter 13 portion of a Chapter "20" was not filed in "good faith". In *In re Hilton*, 122 B.R. 138 (Bankr.M.D.Fla.1990), that bankruptcy court found that a second Chapter 13 filed for the readily discernible purpose of preventing the foreclosure of a mortgage on the homeplace was an obvious abuse of the Bankruptcy Code and "was, in fact, filed in bad faith". In *In re Doss*, 133 B.R. 108 (Bankr.N.D.Ohio 1991), the bankruptcy court easily found that a Chapter 13 case filed 48 minutes prior to a scheduled sheriff's sale while the debtor's Chapter 7 was still pending was filed in "bad faith". At the other end of the spectrum is the bankruptcy court here being reviewed. In *In re Manderson*, 121 B.R. 617 (Bankr. N.D.Ala.1990), this particular bankruptcy court found that the debtor showed perfectly "good faith" when he filed a Chapter 13 immediately after a Chapter 7 discharge, the admitted purpose being to cure the arrearage on his mobile home while preventing the creditor from repossessing. It must be admitted that the bankruptcy court in *Manderson* may have been responding to the encouragement it received in *Saylors, but it must also be kept in mind that the instant case is not a Chapter "20" and therefore is not controlled by Saylors.*

Anyone with eyes can detect a pervasive philosophical difference between various bankruptcy courts in their understanding and application of the concept of "good faith". This court agrees with the holding in *State Educ. Assistance Authority v. Johnson*, 43 B.R. 1016 (E.D.Va.1984), that "good faith" requires the absence of any abuse of the purpose and intent of the Bankruptcy Code. This court also agrees with the *binding* holding in *In re Waldron*, 785 F.2d 936 (11th Cir.1986), *cert. dismissed, Waldron v. Shell Oil Co.*, 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986), that the mere absence of fraud or malintent does not establish "good faith". While this court may have no reason to doubt the basic honesty of the Engleberts, was their intent in harmony with the intent of the Bankruptcy Code? This court thinks not.

Under the admitted facts and circumstances of this case, whether this court makes the determination *de novo* or under the clearly erroneous standard, this court cannot find that the post-default proposal here was made in "good faith" by these debtors, assuming the Trustee to have been their agent. To hold otherwise would be inconsistent with imposing some logical limitation on the defaults that can be tolerated in a Chapter 13 proceeding. It goes almost without saying that every conceivable legal move by a homeowner and by his innovative advocate, and perhaps by a sympathetic Standing Trustee, can be understood when the object is to save the homeplace, but such a salutary and sincere motivation does not automatically equal "good faith". If Congress wants to carry Chapter 13 into the new dimension into which this bankruptcy court would seemingly carry it, and drastically alter the availability of credit for home buyers, such a public policy decision should be made by the legislative branch which is assigned by the Constitution with the responsibility for making such important public policy decisions.

*Black's Law Dictionary*, Fifth Edition, citing *Efron v. Kalmanovitz*, 249 Cal.

App.2d 187, 57 Cal.Rptr. 248, 251 (1967), defines "good faith" as follows:

> An honest intention to abstain from taking any *unconscientious advantage* of another, even through *technicalities* of law, together with absence of all information, notice, or benefit or belief of facts which render transaction *unconscientious.*

(emphasis supplied).

Using this definition, this court, while giving deference to any implicit finding by the bankruptcy court of "good faith" (contrary to the specificity requirements of *Kitchens*), cannot find "good faith". The painfully reconstructed transcript of the hearing of June 4, 1991, reflects that counsel for debtors explained that Mrs. Englebert had discontinued her employment and lost the income thus produced because of the birth of a child, and that her income had been approximately one-third of the total household income. This uncross-examined argument was obviously designed to provide extenuating circumstances to explain the debtors' default, rather than to demonstrate the "good faith" of the Trustee's new proposal. Although there may have been a logical explanation for the second default and arrearage (erroneously stated initially to be substantially less in amount than it actually was), lawyers' argument cannot succeed in convincing this court that a household whose income was reduced by one-third at a time it had acquired another mouth to fee, can, in "good faith", propose to make up the mounting arrearage by larger payroll deductions from the single wage earner. The amended plan approved on June 4, 1991, said nothing about giving up the automobile or about a reduction of $30.00 per month in the arrearage. If it had, the outstanding debt might arguably have become manageable in the future, and a proposal containing the relinquishment of the automobile would more likely have been described as a "good faith" proposition. "Wishful thinking" and "good faith" are not synonyms. It is hard to be totally objective when assessing "good faith", but there is in this case no evidentiary basis for a subjective or sympathetic analysis, whether by the bankruptcy court or by this court. There may be a basis for an honest philosophical difference of opinion about the use and abuse of Chapter 13, but there is no objective data in this case to justify deference to the bankruptcy court's interpretation of the law. This court has looked at the record in the light of the undisputed facts or lack of facts, and this court has also, itself, considered the *Kitchens* factors, and finds that the Engleberts lacked the "good faith" needed to justify the modification of the plan proposed by Mr. Stilson and confirmed by the bankruptcy court.

### Conclusion

The bankruptcy court made no attempt to employ the *Kitchens* factors and therefore made no actual finding on the "good faith" question. Applying the *Kitchens* factors to the undisputed facts, to the extent the relevant facts can be discerned from this record, this court finds, first, that the question of the "good faith" of the debtors is pretermitted by the fact that the amended plan actually approved by the bankruptcy court on June 4, 1991, was put forward by the Standing Trustee and not by the debtors; or, alternatively, that the actual amendment to the plan was not proposed in "good faith" by the debtors. Furthermore, this court is unashamed in reaffirming what it said in *Hollis,* a holding with which the bankruptcy court here being reviewed obviously disagrees, and has a right to disagree with again in the very next case. This court repeats what it said in *Hollis:*

> A more important question, if not the crucial question, raised by Southeast Bank comes from a reading of 11 U.S.C. § 1322(b)(2) and (5), which provides that "a Chapter 13 plan may not modify the rights of a creditor holding a claim secured only by a mortgage on the debtor's principal residence except to cure prepetition defaults within a reasonable time." *In re Nicholson,* 70 B.R. 398, 401 (Bankr.D.Colo.1987). The bankruptcy court in *In re Nicholson* decided simply that where Congress in § 1322(b)(3) allows "the curing or waiving of any de-

fault" it was referring to defaults which occur *pre-petition* and not defaults which occur *post-plan*. The bankruptcy court in *Nicholson* logically concluded that the debtor was not entitled to cure his post-confirmation defaults. This court agrees with the *Nicholson* court. The Bankruptcy Act in this situation contains an absolute principle which leaves no room for a routine or predictable exercise of discretion that invites and even encourages post-confirmation debtor default in Chapter 13 cases.

\* \* \* \* \* \*

[T]here was no area for an exercise of "discretion" or a finding of "good faith" to justify a post-confirmation default. The statutory language in 11 U.S.C. § 1329(a) leaves no such room.

\* \* \* \* \* \*

If a Chapter 13 plan can be amended once to fold in a new arrearage, then there is nothing to prevent a second and a third amendment or modification to the plan, each time adding a new post-confirmation arrearage. On this assumption, is the mortgagee supposed to wait with its tin cup while its contractual rights and its security interest are continually amended and/or suspended, all because done in "good faith" and for "good cause"?

105 B.R. at 1005–07.

Hon. Clarence Allgood is acknowledged to be the pioneer and perfecter of the Chapter 13 concept. His friend and fellow bankruptcy judge, Hon. Stephen B. Coleman, quotes him as follows:

We took the position early that the court [Debtors' Court] had a duty both to the debtor and to the creditor to see that a feasible and workable plan was adopted. *The court then had a strict duty to see that the payments to the court by the debtor were made regularly and promptly.* (emphasis supplied).

Coleman, Stephen B., Jr. & Stephen B. Coleman, *Judge Clarence Allgood* 20 (1991). The Chapter 13 idea only finds acceptance when both creditor and debtor are treated fairly and the debtor is not misled into thinking he can violate the plan and get by with it.

It follows from the fact that the bankruptcy court erroneously approved this plan modification after a second post-confirmation default that it abused its discretion in denying SouthTrust's request for relief from the stay. To prevent a secured creditor from realizing on its security interest in a principal residence in a Chapter 13 proceeding after the debtor has *twice* failed to meet the terms of his approved plan would be the equivalent of allowing plan modifications "willy nilly" every time the debtor defaults. Either the line is drawn by the statutory language, on objective criteria, or bankruptcy courts are left to indulge without bridle their widely divergent, subjective points of view. This court believes that the mortgage lenders and the debtors of Alaska and of Alabama deserve and are entitled to the same treatment under Chapter 13.

For these reasons and the other reasons discussed above, the bankruptcy court's order of June 4, 1991, denying SouthTrust's motion for a lifting of the stay and its order of the same date confirming the Standing Trustee's proposed plan modification, will, by separate order, be vacated and the matter remanded for further proceedings not inconsistent with this opinion.