**In re Sara L. REESE, Debtor.**

**No. 6:07–bk–04456–ABB.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Sept. 29, 2008.

James H. Monroe, James H. Monroe, P.A., Orlando, FL, for Debtor.

## *MEMORANDUM OPINION*

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This matter came before the Court on the Motion to Dismiss (Doc. No. 21) filed by Donald F. Walton, the Acting United States Trustee for Region 21 ("UST"), seeking dismissal of this case pursuant to 11 U.S.C. Sections 707(b)(1), 707(b)(3)(A), and 707(b)(3)(B). A final evidentiary hearing was held on July 15, 2008 and concluded on July 31, 2008 at which the Debtor Sara L. Reese ("Debtor"), counsel for the Debtor, and counsel for the UST appeared. The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## *FINDINGS OF FACT*

The Debtor is a self-employed physical therapist specializing in pediatric physical therapy through her company Sara Reese, Inc. She filed an individual Chapter 7 petition on September 21, 2007 ("Petition Date") accompanied by Schedules, a Statement of Financial Affairs, and a Chapter 7 Statement of Current Monthly Income and Means–Test Calculation (Doc. No. 1). This case is her first bankruptcy filing.

She is married to Douglas Stafford ("Stafford"), who is not a debtor in bankruptcy and was not eligible to seek bankruptcy relief on the Petition Date due to his previous bankruptcy filing. Stafford filed an individual Chapter 7 case in this Court on October 7, 2002 captioned *In re Douglas Gean Stafford,* Case No. 6:02–bk–10990–KSJ, and received a discharge on January 31, 2003. His case was closed on April 23, 2003. The Debtor and Stafford are both approximately thirty years old.

The Debtor and Stafford were married in September 2005. He holds a computer-related degree and has been unemployed since leaving a position with Lake County School District almost three years ago. He intends to return to school to become a physical therapist assistant, but has not enrolled in a program.

This case is governed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005[1] ("BAPCPA"), which, among other things, broadened the standard for dismissal of Chapter 7 cases from "substantial abuse" to "abuse" and created a rebuttable presumption of abuse. The UST seeks dismissal of this case as an abuse of the Bankruptcy Code based on the Debtor's bad faith or, in the alternative, the totality of the circumstances of her financial situation.

The Debtor listed one parcel of real property in Schedule A located at 14101 Ancilla Boulevard, Windermere, Florida 34786 ("Real Property"), which is her

---

1. Pub.L. No. 109–8, 119 Stat. 23 (2005).

homestead owned jointly with Stafford. They purchased the Real Property in December 2006. The Real Property is valued at $300,000.00 and encumbered by first and second priority mortgages held by Countrywide Home Loans, Inc. totaling $344,752.36. Countrywide sought relief from the automatic stay (11 U.S.C. Section 362(a)) for mortgage payment defaults (Doc. No. 51).[2]

The Debtor's Schedule B assets total $31,765.00 in value and include: (i) Fairwinds Bank checking and savings accounts titled in the name of Sara Reese, Inc., the Debtor, and Stafford valued at $50.00; (ii) a Fairwinds Bank checking account titled in the Debtor's and Stafford's names valued at $400.00; (iii) a joint Fairwinds money market account valued at $17,534.00; (iv) various household goods, furniture, clothing, sports equipment, and a watch valued at $500.00; (v) ownership interest in Sara Reese, Inc. valued at $1.00; (vi) a GMC Yukon truck valued at $13,250.00; and (vii) a dog valued at $30.00.

The Debtor filed Amended Schedules B and C (Doc. No. 43) in which she expanded the list of household goods, increased the value of household goods to $2,885.00, and added a wedding ring, wedding band, and two gold bands valued at $2,768.00. The amendments increased her Schedule B asset total to $36,963.00.

The Debtor claimed all of her assets, with the exception of the Yukon truck and jewelry, as fully exempt in her Amended Schedule C. The Chapter 7 Trustee abandoned the Yukon truck due to lack of equity (Doc. No. 31). He declared this case an asset case.

The Debtor listed secured debts of $364,161.36 in Schedule D, which include the Real Property mortgages and GMC's lien on the Yukon truck. She listed no unsecured priority debts in Schedule E and Schedule F general unsecured debts of $378,924.78, which amount consists mainly of credit card debt incurred in 2006 through 2007. The Schedule F debt includes $150,508.13 designated as "Sara Reese, Inc." business debt with "Sara Reese, Inc." as a co-debtor, and individual non-business debt of $228,416.65. The Debtor's debts are primarily consumer debts.

Seven claims in the total amount of $296,906.69 were filed by credit card claimants. The claims bar date was March 24, 2008.

The Debtor, on the Petition Date, had a leased a 2007 Audi pursuant to a Motor Vehicle Lease Agreement executed by the Debtor on February 10, 2007 with a monthly lease payment of $883.27 and a 2006 Land Rover pursuant to a Motor Vehicle Lease Agreement executed by the Debtor on August 30, 2006 with a monthly lease payment of $649.88.[3] She surrendered the Audi (Doc. No. 32) and assumed the lease for the Land Rover (Doc. No. 25). She does not seek rejection of any personal services contracts.

The Debtor listed gross monthly income of $2,500.00 in Schedule I from business operations plus additional income of $2,600.00 contributed by Stafford from his savings, resulting in net monthly income of $4,673.75 after tax deductions. Stafford is listed as "unemployed," but assists with the Debtor's business and takes draws from the business periodically.

The Debtor listed monthly expenses of $4,655.84 in Schedule J resulting in net disposable income of $17.91. The Sched-

2. Countrywide's Motion was denied without prejudice due to improper service on the Debtor (Doc. No. 52).

3. UST's Exh. No. 13.

ule J monthly expenses include vehicle expenses of $822.36 for installment payments and insurance payments of $71.66. The expenses are significantly understated. The vehicle expenses relate only to the Yukon and do not include the Audi and Land Rover lease expenses.

The UST timely filed its Motion to Dismiss and seeks dismissal of this case as an abusive filing on two alternative grounds: (i) the Debtor filed her petition in bad faith; or (ii) the totality of the Debtor's financial situation demonstrates abuse. The Debtor's Means Test sets forth the presumption of abuse does not arise pursuant to Section 707(b)(2) of the Bankruptcy Code (Doc. No. 1). The UST is not challenging the Debtor's bankruptcy filing pursuant to Section 707(b)(2). The Debtor filed no response to the UST's Motion to Dismiss.

No other parties in interest have objected to the Debtor's bankruptcy. No adversary proceedings have been filed against the Debtor, including Section 523 dischargeability of debt actions. The UST's dismissal allegations may be appropriate in a credit card debt Section 523 nondischargeability cause of action. The Debtor's credit card creditors have not challenged the dischargeability of the credit card debts and some did not file claims, despite being provided notice of the designation of this case as an asset case and the necessity of filing a claim to participate in a distribution.

### Sara Reese, Inc.

The Debtor obtained a master's degree in physical therapy in 2002 and incorporated her business Sara Reese, Inc., a Subchapter S Florida corporation, in April 2004. She is the sole shareholder of the company. The Debtor and Stafford are officers of the company; the Debtor is the President and Stafford is the Chief Financial Officer. She maintains the business' office at the Real Property and travels to her clients' homes where she performs physical therapy services.

The Debtor obtains clients through referrals by physicians and physical therapists and through other providers on a contract basis. She has no employees or independent contractors.

Stafford assists the Debtor with the business managing the office and transporting equipment to the clients' homes. His testimony regarding whether he is paid for his assistance was inconsistent. He testified he does not "earn a paycheck" from the business, but later testified he takes draws from time to time. He could not specify the amounts of such draws and no draw documentation was presented. The Debtor and Stafford assert Stafford has contributed funds from his savings to the business, but provided no details of such contributions.

Stafford testified "contributions flowed back and forth" with no further explanation. He is no longer making contributions to the business due to the depletion of his savings.

Stafford has substantial control in their business and personal financial decision-making and record-keeping. The Debtor testified she is "actively involved" in their finances through writing checks and reviewing financial statements. She, however, could not answer basic questions regarding business and personal financial matters such as what monetary contributions Stafford has made to the business, what draws have been taken, the business' profits and/or losses, what is the business' monthly overhead, the accuracy of Schedules I and J, and how gross receipt figures contained in their tax returns were calculated.

A precise picture of the business' financial standing does not exist due to poor

record-keeping and inconsistent, unsubstantiated evidence presented by the Debtor. The Debtor's Schedules I and J, original and Amended Statement of Financial Affairs, Means Test, trial exhibits, and testimony present varying income, expenses, profit, and loss figures. The Debtor's actual monthly expenses cannot be ascertained. The Debtor stated the Schedule J expenses are an "average" and a "projection" and she does not know if Stafford's expenses are included.

It appears the business was nominally profitable in 2005 and incurred substantial losses in 2006 and 2007.[4] The Debtor testified she earns $30,000.00 annually from the business. The 2006 and 2007 income tax returns filed jointly by the Debtor and Stafford reflect they were paid a total of $30,000.00 each year from the business.[5] The Debtor conceded the business is not a profitable venture and she could earn more through other employment. The business is not presently viable.

The Debtor and Stafford financed the business and their living expenses through credit cards. Their finances, both business and personal, are abysmal. They have not maintained corporate formalities for the business. They have commingled business funds with personal funds and used credit card accounts for both business and personal use. They have not kept adequate business or personal financial records. The Debtor stated she and Stafford are attempting to rectify these problems.

### Credit Card Accounts

The Debtor and Stafford utilized various credit cards held in the name of the Debtor and/or her business (collectively, "Debtor's Credit Cards") from 2006 through March 2007. All charges made by Stafford on the Debtor's Credit Cards were made with her consent. The Debtor's Credit Cards include:

(i) American Express ending in 11000;

(ii) American Express ending in 61002;

(iii) American Express ending in 61003;

(iv) Bank of America ending in 47788;

(v) Bank of America ending in 18195 and related to 31913, 87066;

(vi) Bank of America ending in 11916 and 06743;

(vii) Bank of America ending in 40947 and 30583;

(viii) Bank of America ending in 49484 and 69152;

(ix) Bank of America ending in 75619 and 33230;

(x) WFNNB/Kane Furniture ending in 76416;

(xi) HSBC/Sony ending in 67253; and

(xii) Retail Services/Best Buy ending in 65093.[6]

The Debtor, in opening the Best Buy account, completed and executed an account application stating her "annual income" was $120,000.00.[7] She explained $120,000.00 was a "gross estimate" of the business' income. The Debtor conceded the maximum income she earned annually was $30,000.00 and the business has never

---

4. Debtor's Exh. No. 1. The income, profit, and loss figures contained in Debtor's Exh. No. 1 are allegedly based on "tax returns, billing logs, and increased reimbursement rate," but are unsubstantiated. The figures contained in the exhibit do not correspond to the figures contained in the Debtor's 2006 and 2007 income tax returns (UST's Exh. Nos. 13, 14, 15).

5. UST's Exh. Nos. 13, 14, 15.

6. UST's Exh. Nos. 11, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 32, 33, 34.

7. UST's Exh. No. 30.

generated income, gross or net, of $120,000.00.

The Debtor and Stafford, prepetition, incurred average *monthly* expenses of *$39,552.38* using the Debtor's Credit Cards.[8] The expenditures were for business and personal purposes. Their average monthly expenditures included: (i) $4,943.22 for automobile payments; (ii) $15,409.43 for credit card payments; (iii) $5,457.27 for entertainment; (iv) $4,292.33 for furniture and household items; and (v) $1,569.92 for grooming and clothing.[9] Their annualized expenditures totaled $474,658.26.[10]

The Debtor and Stafford closed or stopped using the Debtor's Credit Cards in March or April 2007 and they opened new accounts in Stafford's name (collectively, "Stafford Credit Cards"). All charges made by the Debtor on Stafford's Credit Cards were made with his consent. The accounts include: (i) Washington Mutual ending in 34423; (ii) Fairwinds ending in 97695; and (iii) Capital One ending in 78736.[11]

Stafford and the Debtor used Stafford's Credit Cards both pre- and post-petition. Their expenditures were for business and personal purposes. They incurred average monthly expenses during the period April 7, 2007 to December 2007 of $8,920.57.[12] The monthly expenditures include: (i) $5,301.63 for entertainment; (ii) $1,690.70 for furniture and household items; and (iii) $1,389.48 for grooming and clothing. They incurred total expenses of $80,285.09 during that nine-month period.[13]

The Debtor and Stafford took vacations, financed by the credit cards, with one two-week trip to the West Coast and Canada straddling the Petition Date. They stayed at luxury resorts, dined lavishly, rented limousines, took cash advances, and incurred additional debt for extensive shopping. They incurred credit card charges of $836.24 and $1,002.41 for dinners and $4,764.46 for lodging in Seattle in February 2007, $897.75 for a dinner in Seattle on the Petition Date, and $5,654.42 post-petition at a Canadian resort.[14]

The Debtor and Stafford testified the February 2007 Seattle travel and $836.24 dinner charges were incurred in exploring "business opportunities," but provided no explanation as to how opportunities in Seattle related to the Debtor's Florida business.

The Debtor and Stafford financed, through the credit cards, a "proposal trip" for the Debtor's brother to celebrate his engagement and spent approximately $30,000.00. The Debtor and Stafford testified the brother was to repay them for the trip, but they could not delineate any repayment details.

The Debtor, using the credit cards, made substantial gifts prepetition to family members and friends, which she did not disclose in her original Statement of Financial Affairs. She made gifts totaling $5,500.00 within a three-month period including $2,000.00 airline tickets, $500.00 "show tickets," and $1,100.00 "outdoor gear."

The Debtor and Stafford made nominal credit card account payments using per-

---

8. UST's Exh. No. 9.

9. *Id.*

10. *Id.*

11. UST's Exh. Nos. 12, 35, 36, 37.

12. UST's Exh. No. 10.

13. *Id.*

14. UST's Exh. Nos. 21, 22 at p. 3.

sonal and/or business funds. The majority of their credit card "payments" were made through balance transfers and cash advances.[15]

The Debtor and Stafford explained they incurred such extensive credit card debt in furnishing the Real Property, which they moved into in December 2006, putting together a home office for the business, and expanding the business. They testified the large luxury vehicles, the Yukon and Land Rover, were necessary for transporting the Debtor's business equipment to clients' homes.

They testified they incurred the credit card debt believing they could pay the debt from increased business income generated through business expansion. Their expansion plan included hiring another physical therapist and development of a Medicaid claim income stream by taking on Medicaid patients. Neither facet of the plan came to fruition.

The Debtor did not hire a physical therapist. She attempted to develop a Medicaid claim income stream by taking on Medicaid patients and submitted a number of Medicaid claims for her services; all of her claims were denied in March 2007. She attended a Medicaid meeting in November 2005, completed the paperwork in early 2006 to have her business set up in the Medicaid system and obtained training through a Medicaid fiscal agent.

The denial code contained no explanation for the claim denials and may have been based on the fact her company was not assigned a provider identification number. She attempted to obtain information from her Medicaid field representative, but the representative had quit. The denial of claims was a state-wide problem and ap-

parently the Medicaid system has not paid many providers in Florida.

The Debtor failed to explain what actions she has taken to remedy the rejected claims. Her explanations were not comprehensible and were unresponsive to questions regarding what remedial options exist and any attempts she has made to address the claims with Medicaid. She presented no documentation regarding the claims or their rejection. She stated she has not been paid on any of the claims. The Form 1099 issued by the Florida Agency for Health Care Administration attached to the Debtor's 2007 tax return reflects, contrary to her testimony, she received Medicaid payments of $6,414.66 in 2007.[16]

The Debtor and Stafford stopped using and making payments on the Debtor's Credit Cards in March 2007 after the Medicaid claims were rejected. The Debtor began considering bankruptcy in April 2007 and first met with bankruptcy counsel in May or June 2007. She explained she filed for bankruptcy to obtain relief from the credit card debt when it became apparent the business expansion plan would not be viable.

The Debtor testified she and Stafford have attempted to reduce their expenses post-petition and cites the surrender of the Audi and Yukon as examples of expense reduction. Stafford, however, obtained a new 2008 Land Rover in December 2007 with payments of $600.00 per month. He testified the vehicle is necessary for transporting equipment and was the best deal they could obtain due to his special relationship with the Land Rover dealership. Stafford has been continuously searching for employment, but could not detail his efforts.

---

15. Debtor's Exh. No. 2; UST's Exh. Nos. 11, 12, 16, 17, 18, 19.

16. UST's Exh. No. 15.

### UST's Abuse Allegations: Bad Faith

The UST seeks dismissal of this case as an abusive filing on two alternative grounds pursuant to Section 707(b)(3) of the Bankruptcy Code: the filing constitutes a bad faith filing, or it is abusive based upon the totality of the circumstances of the Debtor's financial situation. Section 707(b)(3) is a subjective test turning upon the particular facts of a case. The UST has the burden to establish this case constitutes an abusive filing.

Circumstantial factors considered indicia of bad faith are analyzed in determining whether grounds for dismissal exist. The factors are historical having been developed through pre-BAPCPA case law. Such circumstantial factors are relevant to a Section 707(b)(3)(A) analysis and include:

(i) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors.

(iii) The debtor made purchases on the eve of filing.

(iv) The Debtor made incomplete or false disclosures.

(v) The Debtor failed to cooperate with the trustee.

Bad faith is determined on a case by case basis and other circumstantial factors may be relevant depending on a bankruptcy case's particular facts. Most of the historical circumstantial factors are not relevant to the Debtor's case.

The UST asserts, as an indicia of bad faith, the Debtor failed to file accurate and complete Schedules and Statement of Financial Affairs. The Debtor remedied any inaccurate and incomplete disclosures to the best of her ability. She amended Schedule B and the Statement of Financial Affairs subsequent to her deposition by the UST and in compliance with the UST's amendment request. She explained the rings were omitted from original Schedule B due to her oversight. Her testimony was credible.

Schedules I and J, although inaccurate, are not purposefully inaccurate. The Debtor, as the result of her limited control and understanding of financial matters and inadequate record-keeping, does not know what her actual monthly income and expenses are. The Schedules are her best effort at documenting her monthly income and expenses. The Debtor has cooperated with the Chapter 7 Trustee and the UST.

The UST asserts the Debtor's lavish credit card spending, both prep- and post-petition, constitutes bad faith. While the Court does not condone the excessive and irresponsible expenditures, such usage does not constitute a basis for dismissal. The Debtor ceased using her credit cards five months prior to the Petition Date when her Medicaid claims were rejected and it was apparent the business was not viable. She did not incur any charges "on the eve of bankruptcy."

The credit card charges made post-April 2007 and post-petition were incurred on Stafford's cards and not subject to the Discharge in this proceeding. The UST asserts Stafford is intentionally unemployed and despite his unemployment continued to use the Stafford Credit Cards. Stafford is not a debtor in this case. His unemployment, whether intentional or not, is not relevant to this proceeding and is not an indicia of the Debtor's bad faith.

The Debtor's and Stafford's explanation they incurred the debt believing they could pay it through income from business expansion was credible. Their belief was

unrealistic, but credible. An unrealistic belief in the ability to pay one's creditors does not constitute bad faith. If such a belief constituted bad faith, a significant number of bankruptcy petitions would be subject to dismissal.

The Debtor immediately stopped using her credit cards when the Medicaid claims were rejected and sought bankruptcy protection only after it became apparent the business expansion plan had would not succeed. The rejection of the Debtor's Medicaid claims was a turning point in her business. Perhaps if the claims had been paid, her business could have been viable and the credit card debt could have been resolved without bankruptcy protection.

A bad faith analysis focuses on the debtor's motivation in filing for bankruptcy. The debtor must have acted with improper intent for bad faith to exist. The circumstantial factors relevant to a bad faith analysis correlate to improper intent. Dismissal is required where the circumstantial factors establish the debtor was motivated to file by improper purposes. The dismissal of bad faith filings preserves the integrity of the bankruptcy process and ensures only those debtors who have filed for bankruptcy in good faith are afforded relief. Grounds for dismissal do not exist where a debtor engaged in excessive pre-petition spending and no indicia of bad faith are present.

The Debtor did not file this case for improper purposes. She had no bad intent. She filed this case to obtain relief from her crushing credit card debt. Her incurring of the debt, as the Debtor concedes, was irresponsible, but irresponsibility does not constitute bad faith. She did not purposefully accumulate the debt knowing she would seek to discharge it in bankruptcy. She incurred the debt believing it could be paid through increased business revenues. The business plan

failed and her only recourse for addressing the debt was to seek Chapter 7 bankruptcy relief.

No indicia of bad faith exist. The Debtor did not file her petition in bad faith. The UST has not established a basis for dismissal of this case pursuant to Section 707(b)(3)(A) of the Bankruptcy Code.

### UST's Abuse Allegations: Totality of the Circumstances

The UST, in the alternative, seeks dismissal of this case based on the totality of the circumstances of the Debtor's financial situation. The core inquiry of the totality of the circumstances test is whether the Debtor has a meaningful ability to repay her unsecured debts. The feasibility of a hypothetical Chapter 13 plan is relevant to a totality of the circumstances analysis. Post-petition events are relevant to the analysis.

The Debtor's financial records, though convoluted and incomplete, reflect the Debtor's annual household income is, at a maximum, $30,000.00. The Debtor's Schedule I overstates her monthly income by $2,600.00 because Stafford is no longer making contributions to the business. His savings have been depleted. Her Schedule J expenses are understated in that they fail to include the actual vehicle expenses.

The Debtor, based upon her identifiable monthly business and personal expenses, has no disposable monthly income. She has no disposable income to fund a hypothetical Chapter 13 plan. She has no ability to repay even a nominal portion of her debts through a hypothetical Chapter 13 plan.

The UST has not established the totality of the circumstances of the Debtor's financial situation demonstrates abuse pursuant to Section 707(b)(3)(B). Granting the Debtor relief would not be an abuse of the

provisions of Chapter 7. The UST's Motion is due to be denied.

### CONCLUSIONS OF LAW

A Chapter 7 case filed by an individual with primarily consumer debts is subject to dismissal, or conversion with the debtor's consent, if, after notice and a hearing, a Court "finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1) (2007). The standard for dismissal prior to BAPCPA was "substantial abuse."

The 2005 Bankruptcy Code amendments, as is manifest by the legislation's title, "Bankruptcy Abuse Prevention and Consumer Protection Act," were intended to curb what was perceived to be abusive bankruptcy practices, and to ensure debtors with the ability to repay their debts do so:

> The purpose of the bill [S. 256] is to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors.
>
> . . .
>
> The heart of the bill's consumer bankruptcy reforms consists of the implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'), which is intended to ensure that debtors repay creditors the maximum they can afford.

H.R. REP. No. 109–31, pt. 1, at 2 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 89.

■ Congress created in Section 707(b) a needs-based test to remedy the "inherently vague" "substantial abuse" dismissal standard. *Id.* at 12, U.S.C.C.A.N. at 98. Section 707(b) contains two tests for determining abuse: the objective test of Section 707(b)(2) and the subjective test of Section 707(b)(3). *In re Parada,* 391 B.R. 492, 496 (Bankr.S.D.Fla.2008). The objective test of Section 707(b)(2) is not relevant to this proceeding as the presumption of abuse has not arisen.

■ The UST has the burden to establish the Debtor's filing is abusive pursuant to Section 707(b)(3). *Id.* Section 707(b)(3) sets forth two bases for dismissal:

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3). The UST seeks dismissal of this case pursuant to Section 707(b)(3)(A), or, in the alternative, Section 707(b)(3)(B).

■ Pre–BAPCPA case law is relevant in Section 707(b)(3)(A) and Section 707(b)(3)(B) determinations. *In re Henebury,* 361 B.R. 595, 604 (Bankr.S.D.Fla. 2007) "Section 707(b)(3) incorporates the judicially constructed concepts of bad faith and totality of the circumstances. Therefore pre-BAPCPA case law applying these concepts can still be helpful in determining abuse under BAPCPA." *Id.* The Eleventh Circuit Court of Appeals has not yet addressed Section 707(b)(3)(A) or 707(b)(3)(A).

The Debtor has primarily consumer debts. 11 U.S.C. § 101(8). She is subject to the provisions of Sections 707(b)(1) and (b)(3). She does not seek rejection of a personal services contract.

### Bad Faith

■ Good faith is an implicit requirement for filing for bankruptcy protection. *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393, 1394 (11th Cir.1988); *Shell Oil*

Co. v. Waldron (In re Waldron), 785 F.2d 936, 941 (11th Cir.1986). The bankruptcy laws are "intended to give a 'fresh start' to the 'honest but unfortunate debtor.' " *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S.Ct. 1105, 1116, 166 L.Ed.2d 956 (2007) (*citation omitted*).

A petition filed in "bad faith" is subject to dismissal pursuant to 11 U.S.C. Section 707(b)(3)(A). The Bankruptcy Code does not define "bad faith." BAPCPA's legislative history does not define "bad faith." The existence of bad faith is determined by circumstantial factors, which have been developed through case law. The historical factors set forth in pre-BAPCPA case law are relevant to a Section 707(b)(3)(A) analysis. In re *Parada*, 391 B.R. at 499.

■ The circumstantial factors include:

(i) The debtor has only one asset in which it does not hold legal title.

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors.

(iii) The debtor has few employees.

(iv) The debtor is not financially distressed.

(v) The property is the subject of a foreclosure action as a result of arrearages on the debt.

(vi) The debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in a state court action.

(vii) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

(viii) The debtor made purchases on the eve of filing.

(ix) Incomplete or false disclosures by the debtor.

(x) Failure by the debtor to cooperate with the trustee.

In re *Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394–95; In re *Waldron*, 785 F.2d at 939–40; In re *Parada*, 391 B.R. at 499. The list of factors is non-exclusive and dismissal is determined on a case by case basis. *State Street Houses, Inc. v. New York State Urban Dev. Corp. (In re State Street Houses, Inc.)*, 356 F.3d 1345, 1347 (11th Cir.2004); In re *Parada*, 391 B.R. at 499.

■ The common thread running through all of the indicia of bad faith is improper intent. A debtor, for bad faith to exist, must have purposefully acted and such action was motivated by an improper purpose. *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984); ("In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process. . . ."); In re *Waldron*, 785 F.2d at 941 ("[I]t is incumbent upon the bankruptcy courts to examine and question the debtor's motives" where a "petition appears to be tainted with a questionable purpose."); *Bilzerian v. SEC (In re Bilzerian)*, 276 B.R. 285, 294 (M.D.Fla.2002) (dismissing debtor's petition where his "motives and purposes" in filing were not consistent with the purposes of chapter 7).

■ None of the indicia of bad faith are present in the Debtor's case. She did not file with improper motives and purposes abusing the judicial process. Her motives and purposes in filing for bankruptcy relief are consistent with the purposes of Chapter 7. She incurred significant debts believing she could repay them through increased business revenues. Her business plan failed in part due to the rejection of her Medicaid claims, and she had insufficient income to service her debts. The Debtor was irresponsible in incurring such a large amount of credit card debt, but

irresponsibility does not constitute bad intent.

The Debtor did not file her petition in bad faith. The UST has not established a basis for dismissal of this case pursuant to Section 707(b)(3)(A).

### Totality of the Circumstances

■ The "totality of the circumstances" test of Section 707(b)(3)(B) focuses solely on a debtor's financial situation and the indicia of bad faith are irrelevant. *In re Parada*, 391 B.R. at 499. Congress' creation of the disjunctive provisions (A) and (B) of Section 707(b)(3) establishes "bad faith" "is a ground for 707(b) relief independent of financial circumstances indicating that the debtor could repay debt." Eugene R. Wedoff, *Means Testing in the New § 707(b)*, 79 Am. Bankr.L.J. 231, 236 (Spring 2005).

■ The core inquiry of a Section 707(b)(3)(B) analysis is whether the debtor's financial situation indicates he has the ability to pay a substantial portion of his unsecured nonpriority debts. *In re Henebury*, 361 B.R. at 607. The courts analyze whether a debtor has sufficient projected disposable income to fund a hypothetical Chapter 13 plan, thereby making 11 U.S.C. Section 1325 relevant to a Section 707(b)(3)(B) determination. *Id.* at 611.

Section 1325(b)(2) defines "disposable income" as:

(2) Current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable non-bankruptcy law to the extent reasonable necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions ... and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (2007).

■ Post-petition pre-discharge events are relevant to a Section 707(b)(3)(B) analysis. *In re Parada*, 391 B.R. at 500; *In re Henebury*, 361 B.R. at 611. Facts that are "unknown or highly speculative" are not relevant to the analysis. *In re Parada*, 391 B.R. at 502.

■ The Debtor, based upon her documented annual income of $30,000.00 and expenses, has no disposable income. She does not have a meaningful ability to repay her debts through a hypothetical Chapter 13 plan.

The UST has not established granting the Debtor relief would be an abuse of the provisions of Chapter 7 pursuant to 11 U.S.C. Section 707(b)(3)(B). The UST's Motion is due to be denied.

### Conclusion

The Debtor's and Stafford's credit card usage was extravagant and irresponsible. Their belief they could repay the debt from an increase in business income through the business' expansion, which never occurred, was unrealistic, but does not constitute bad faith.

The credit card creditors had a right and an opportunity to challenge the dischargeability of their debts or the Debtor's discharge if her credit card usage was inappropriate. The Debtor's creditors have been silent in this case.

The Debtor's only recourse for debt relief is Chapter 7. She does not have the resources to structure a non-bankruptcy

workout with her creditors, is not eligible for Chapter 13, and lacks the disposable income to fund a Chapter 13 or a Chapter 11 plan.

The Debtor's debt burden is the result of poor financial decisions. She filed this case in good faith seeking relief to obtain a "fresh start." Her motives and purposes in filing are consistent with the purposes of the Bankruptcy Code.

Section 707(b)(3) is not a basis for dismissal of a case based upon a Debtor's imprudent financial decisions, with no meaningful ability to repay her unsecured debts, resulting in a debtor with no relief for an untenable financial situation.

Accordingly, it is

**ORDERED, ADJUDGED AND DE-CREED** that the UST's Motion to Dismiss is hereby **DENIED.**